JOSEPH MADDALONI *vs.* WESTERN MASS. BUS LINES, INC.

Hampden. March 3, 1982. — July 27, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Contract,* Performance and breach, Employment. *Damages,* Employment contract.

In an action by an employee who was discharged under a contract of employment terminable at will, evidence warranted the jury's verdict for the employee on his claim that he had been discharged in bad faith rather than for legitimate business reasons. [881-882]
An employee serving under a contract of employment terminable at will who was discharged in bad faith was entitled to recover as damages the amount which the jury determined would be payable in commissions for his services in accordance with the contract, but was not entitled to recover lost wages and fringe benefits. [882-884]

CIVIL ACTION commenced in the Superior Court on August 21, 1974.

The case was tried before *Griffin,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Donald A. Beaudry* for the plaintiff.

*William F. Lally* for the defendant.

ABRAMS, J. We consider whether an employee, serving under a contract of employment terminable at will, may recover for lost wages and fringe benefits in addition to commissions related to past services, when the employee is discharged in bad faith. See *Fortune* v. *National Cash Register Co.,* 373 Mass. 96 (1977). After a trial in the Superior Court, the jury returned a verdict for the plaintiff on his claim that he was discharged in "bad faith." By interrogatories accompanying the general verdict, see note 6, *infra,* the jury determined that the plaintiff would have earned $61,000 in commissions for past services. The judge also submitted the

issue of damages to the jury on a quantum meruit theory. The jury determined that on a quantum meruit basis, the plaintiff was entitled to damages in the amount of $28,000.

The judge entered a judgment on the quantum meruit theory. Both parties appealed. The Appeals Court concluded that the plaintiff was entitled to $61,000 in lost commissions, and that the issue of damages for lost wages and fringe benefits should have been submitted to the jury. See *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, 12 Mass. App. Ct. 236, 248-250 (1981). For the reasons set forth in this opinion, we agree with the Appeals Court that the plaintiff was entitled to $61,000 in damages for lost commissions. A majority conclude that the judge correctly declined to allow the jury to consider the issue of the plaintiff's damages for lost wages and fringe benefits.

We summarize the evidence most favorable to the plaintiff and resolve in his favor all reasonable inferences that could be drawn from that evidence. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 660 (1981); *Fortune* v. *National Cash Register Co.*, supra at 97. The plaintiff was hired by the defendant, Western Mass. Bus Lines, Inc. (WMBL), as general manager in April, 1964. At that time, the president of WMBL, John F. Fortier, was interested in obtaining a grant of interstate charter rights from the Interstate Commerce Commission (ICC).[1] The plaintiff had considerable experience appearing before the Massachusetts Department of Public Utilities (DPU) and the ICC, in order to secure new operating authorities. Besides dealing with the ICC, the plaintiff's duties as general manager of WMBL included arranging the operating schedule, soliciting, advertising for, and quoting prices on charter trips, preparing the billing, checking employee time-cards, and generally overseeing the entire operation.

About six weeks after the plaintiff was hired, the plaintiff drafted, and the parties executed, a contract setting forth

---

[1] Interstate charter rights are considered the best income-producing rights that any carrier could receive. See *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, 12 Mass. App. Ct. 236, 238 (1981).

the terms of his employment.[2]  No definite term of employment was set out in the contract, and thus the contract was terminable at will.  See *Simons* v. *American Dry Ginger Ale Co.*, 335 Mass. 521, 524-525 (1957).  See also *Fortune* v. *National Cash Register Co.*, *supra* at 100-101.[3]  The contract provided that the plaintiff would receive a salary of $120 a week plus Blue Cross and Blue Shield insurance benefits.  Additional weekly compensation was to be provided at the discretion of the defendant.  The contract also provided that after the ICC granted the defendant interstate charter rights, the plaintiff would receive a five percent commission on the special and charter revenues of the defendant as reported to the DPU and the ICC.  The commission was to be paid to the plaintiff on the fifteenth of each month.

The defendant obtained interstate charter rights in June, 1966, and the plaintiff received the commissions called for

---

[2] The contract provides in pertinent part: "For Good and Valuable Consideration and in consideration of mutual covenants and agreements contained herein, the parties hereto agree as follows:

"1. That the Employer shall engage the services of the Employee as General Manager.

"2. The Employee agrees to work for the Employer in an industrious and capable manner.

"3. The Employer agrees to compensate the Employee as follows:

"a. The same as presently paid, namely $120.00 per week.  In addition, Blue Cross and Blue Shield monthly insurance cost for the Employee will be paid by the Employer.

"b. Any additional weekly compensation to that mentioned in paragraph 3a will rest with the Employer.

"c. Immediately after the grant of Inter-state Charter Rights to the Employer by the Interstate Commerce Commission, the Employer further agrees to compensate the Employee, at the rate of 5% commission of the total Special and Charter revenue income as reported to the Massachusetts Department of Public Utilities and the Interstate Commerce Commission.  This 5% commission compensation will be paid to the Employee by the Employer each month, namely, on the 15th day of each month, of the total Special and Charter revenue income received by the Employer for the past month."

[3] Unlike the contract in *Fortune*, the contract in this case contained no provision for termination of the agreement.  The contract in this case also contained terms which indicate that a continuous relationship was contemplated.  See note 2, *supra*.

in the contract for five and one-half months. In November, 1966, the grant was revoked after the United States District Court for the District of Massachusetts held that the ICC had erred in granting the interstate charter rights to the defendant. The plaintiff's commissions under the contract ceased thereafter.

In September, 1970, Mario Cantalini bought WMBL and became its president. The plaintiff remained as general manager. In October or November, 1970, the plaintiff met with Cantalini and his attorney to discuss the need for obtaining interstate charter rights. Cantalini then took out the plaintiff's employment contract and handed it to his attorney to read. The attorney read it and returned it to Cantalini, stating that "this would be all right with the company."

Sometime later the plaintiff and Cantalini sought to obtain from the ICC a grant of interstate charter rights. On October 1, 1973, the ICC again granted interstate charter rights to the defendant. About a week later, the plaintiff told Cantalini, "[N]ow that we [have] received the operating authority from the I.C.C., . . . that portion of my agreement on the commission [is] now in effect." Cantalini replied that "he didn't understand it to be that way, but that . . . he would check the agreement." On November 14, 1973, a day before the plaintiff's commissions for October became payable under the contract, Cantalini telephoned the plaintiff and asked him if he had to pay the five percent commission for the month of October. The plaintiff responded, "[Y]es, that was in accordance with the agreement he [Cantalini] had accepted." Cantalini replied "that it was a lot of money, that it was cream off the top." Cantalini sought to postpone the discussion, but the plaintiff stated, "We are not going to talk about it later because tomorrow is the day that I am supposed to be paid . . . ." The last thing Cantalini said before he hung up was "all right."

In addition to the payment for October, the plaintiff received commissions for November and December. On January 19, 1974, Cantalini discharged the plaintiff from his employment. Cantalini stated that he was discharging the

plaintiff because the plaintiff was responsible for the poor profit statement which Cantalini claimed was inhibiting his attempt to sell the company. "[B]esides," stated Cantalini, "you wanted to get paid the commission under the agreement you made with Jack [Fortier]." Thereafter, the plaintiff filed a complaint in the Superior Court alleging that the defendant's termination of the contract was based on a bad faith attempt to avoid paying the plaintiff his commissions.

1. *Liability of defendant for breach of contract.* The defendant claims that there was insufficient evidence to support the jury's verdict, and that the judge should have granted its motion for a directed verdict or judgment notwithstanding the verdict. The Appeals Court concluded that "[f]rom the evidence as set out above, the jury could have found facts which bring this case within *Fortune.*" *Maddaloni* v. *Western Mass. Bus Lines, Inc.,* 12 Mass. App. 236, 241 (1981). We agree.

In *Fortune,* we held "that an employer may not in every instance terminate without liability an employment contract terminable at will. . . . [W]e upheld the plaintiff's claim for future commissions based on past service when the employer terminated the plaintiff's employment without good cause and for the purpose of retaining the sales commissions for itself." *Cort* v. *Bristol-Myers Co.,* 385 Mass. 300, 303 (1982). *Fortune* v. *National Cash Register Co.,* 373 Mass. 96, 104-105 (1977). In that case we declined to "speculate as to whether [a] good faith requirement is implicit in every contract for employment at will." *Fortune* v. *National Cash Register Co., supra* at 104. We believe that the plaintiff in this case, like the plaintiff in *Fortune,* could reasonably expect that his employment would not be terminated by the defendant in order to deny him commissions.

The defendant argues that there was insufficient evidence of bad faith in this case, and that the judge should have granted its motion for a judgment notwithstanding the verdict. We do not agree. The evidence and the reasonable inferences to be drawn therefrom support the jury's ver-

dict.[4]  At the time of his discharge the plaintiff had been in the transportation business for approximately thirty-eight years.  He had been the defendant's general manager for six years before Cantalini acquired WMBL, and for approximately four years since Cantalini acquired the company. After Cantalini acquired another bus company, he made the plaintiff its general manager, and the two companies were run out of the same office.  By January, 1974, the plaintiff's salary was $250 a week.  It is not clear from the record how much of the increase in salary was authorized by Cantalini.  (The record indicates that he authorized at least $50 a week.)  In 1972, the plaintiff was provided with pension benefits, apparently authorized by Cantalini.[5]  In addition, for the four years that Cantalini owned WMBL, the plaintiff was provided each year with a new, fully equipped automobile with all expenses paid.  Finally, although there was evidence of poor profits prior to the time that the plaintiff's commissions became payable under the contract, Cantalini did not discharge the plaintiff until after the commissions became payable.  From this evidence, the jurors could conclude that Cantalini discharged the plaintiff to avoid paying the plaintiff's commissions.  The jurors were not required to believe Cantalini's testimony that the plaintiff was discharged for legitimate business reasons. When evidence on a contested matter is conflicting, the issue is for the trier of fact.  See *Fortune, supra* at 106; *Howes* v. *Kelman,* 326 Mass. 696, 696-697 (1951).

2. *Damages.*  The jury were instructed that, in determining damages, they should answer two questions, Mass.

---

[4] The jury were instructed that if they found that "the firing was *primarily* to deprive him of commissions which were to have been paid to him" (emphasis added), they should return a verdict for the plaintiff.  We need not determine whether use of the word "primarily" was more favorable to the defendant than was required.  See *Fortune* v. *National Cash Register Co.,* 373 Mass. 96, 105-106 (1977).

[5] The benefits for 1973 had not been calculated at the time the plaintiff was discharged.

R. Civ. P. 49 (b), 365 Mass. 812 (1974),[6] concerning the amount of commissions due under the contract. The judge refused to allow the jury to consider lost wages and fringe benefits. Although the jury determined that the plaintiff could reasonably have expected to be paid $61,000 in commissions during the course of his employment, the judge awarded the plaintiff $28,000 (the amount the jury determined was "attributable" to the plaintiff's work and effort). See note 6, *supra*. The Appeals Court concluded that the plaintiff was entitled to $61,000 in commissions rather than $28,000. We agree.

By limiting commissions to the amount "attributable to [the plaintiff's] work and efforts," the judge permitted recovery on what appears to be a quantum meruit theory. However, as in *Fortune*, "in this case there is remedy on the express contract." *Fortune* v. *National Cash Register Co.*, *supra* at 102. Thus, we need not reach any issues raised by a theory of quantum meruit recovery. *Id.* at 102 n.9. The plaintiff was entitled to $61,000, the amount which the jury determined would be payable in commissions for his services in accordance with the contract.

There is no merit to the defendant's claim that the plaintiff's interest in the commissions is distinguishable from the interest of the plaintiff in the *Fortune* case. The defendant claims that the plaintiff's right to commissions only vested each month that the plaintiff was employed, and, therefore, there were no commissions due the plaintiff. Contrary to the defendant's argument that the commissions payable in *Fortune* are distinguishable because they had already vested, in that case we stated, it is "clear that under the express

[6] The interrogatories asked: "1. If the plaintiff had not been discharged, what do you find is the fair amount of commissions that he could reasonably be expected to earn during his employment by the defendant 'at the rate of 5 % commission of the total Special and Charter revenue income as reported to the Massachusetts Department of Public Utilities and the Interstate Commerce Commission' after January 19, 1974?

"2. Of the amount that you have found in answer to Question #1, what part is attributable to Mr. Maddaloni's work and efforts in obtaining charter business for Western Mass. Bus Lines, Inc.?"

terms of the contract Fortune . . . received all the bonus commissions to which he [was] entitled." *Fortune, supra* at 101.

In this case the plaintiff used his skills, knowledge, and experience to assist the defendant in obtaining interstate charter rights from the ICC. The contract provided for compensation in the form of commissions if the charter rights were secured. The plaintiff is entitled to receive the commissions, and a discharge to avoid payment of commissions is a discharge in bad faith. An employer may not discharge an employee in order to avoid the payment of commissions or to reap for itself financial benefits due its employee. *Id.* at 105. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 672 (1981).

In his appeal, the plaintiff claims that the jury should have been allowed to consider the issue of damages for lost wages and fringe benefits. In *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 101 n.7 (1977), we left open the question whether such damages "might be justified in cases of bad faith termination." A majority of the court believe that the judge properly refused to instruct the jury on the issue of lost wages and fringe benefits unrelated to past services.

In *Fortune* v. *National Cash Register Co., supra,* and *Gram* v. *Liberty Mut. Ins. Co., supra,* we imposed an obligation of good faith and fair dealing to prevent an employer from being unjustly enriched by depriving the employee of money that he had fairly earned and legitimately expected. However, a majority do not believe that an employee should be entitled to benefits which he neither contemplated nor included in his contract.[7]

We therefore vacate the judgment and remand the case to the Superior Court for entry of judgment for the plaintiff in accordance with this opinion.

*So ordered.*

---

[7] We need not decide in what circumstances public policy may require additional damages, or a different measure of damages. See *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 303 (1982); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 668-669 (1981); *Fortune, supra* at 102 n.8.