S.B. MITFORD, Appellant,

v.

Ernest Ferdinand de LASALA, Australaska Corporation, Cosmopolitan Development Corporation, Alaska Enterprises Limited, Compass Enterprises, Inc., San Miguel Navigation Co., S.A., Pan-Pacific Navigation Co, Inc., Ocean Bulkers, Inc., John Manners & Co., Ltd., John Manners (Holdings) Ltd., San Roberto Steamship Company, S.A., Oceanic Finance Co., S.A., Summit Finance Co., S.A., North Breeze Navigation Co., Ltd., South Breeze Navigation Co., Ltd. (Hong Kong), San Jeronimo Steamship Company, S.A., Cosmopolitan Finance Corp., South Breeze Navigation Co., Ltd. (Liberia), Compania Nueva Del Oriente S.A., Indo-Pacific Corp., Java International Corp., Compass Shipping Co., Ltd., and Northern Enterprises, Ltd., Appellees.

No. 6755.

Supreme Court of Alaska.

May 20, 1983.

David G. Shaftel and Wayne Anthony Ross, Anchorage, for appellant.

Richard A. Helm, Burr, Pease & Kurtz, Anchorage, for appellees Ernest de Lasala, Australaska Corp., Cosmopolitan Development and Alaska Enterprises Limited.

William H. Bittner, Patrick Owen, Birch, Horton, Bittner, Monroe, Pestinger & An-

derson, Anchorage, for appellees Compass, San Miguel, Pan-Pacific, Ocean Bulkers, John Manners, San Roberto, Oceanic Finance, Summit Finance, North Breeze, South Breeze, San Jeronimo, Cosmopolitan Finance, Compania Nueva Del Oriente, Indo-Pacific, Java Intern., Compass Shipping and Northern Enterprises.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and DIMOND, Senior Justice.*

## OPINION

MATTHEWS, Justice.

This case is an appeal from several partial summary judgment rulings that had the effect of disposing of all issues before the superior court. The issues on appeal concern interpretation of an employment contract, quantum meruit, and attorney's fees. The case involves 23 defendants. Defendants Ernest Ferdinand de Lasala, Australaska Corporation, Cosmopolitan Development Corporation, and Alaska Enterprises, Ltd. at times will be referred to collectively as "Australaska." The remaining 19 defendants will be collectively referred to as "Compass."

In 1961, S.B. Mitford moved from Hong Kong to Anchorage. At that time, he had been employed for approximately nine years as an accountant and later comptroller in Hong Kong for various corporations owned or controlled by Robert P. de Lasala. According to a letter of September 27, 1961 written by Robert's son Ernest de Lasala, Mitford was to "attach [himself] as the accountant of Australaska Corporation and Cosmopolitan Development Corporation and their affiliates, . . ." Australaska and Cosmopolitan were both owned by the de Lasala family and were primarily involved in long-term investment in Alaska real estate. According to the same letter, Mitford was to be employed on "the same terms and conditions as Mr. Don Smith, viz letter to

him of 15th August, 1960." Don Smith's employment agreement stated that the

> terms of employment . . . are that you would receive a remuneration in lieu of a fixed salary based on 10% (Ten percent) of profits as computed in accordance with the rules of Federal Income Tax BUT with a minimum drawing allowance of $850.- per month in all . . . .

> The period of your employment with us is for an indefinite period subject to determination by either side giving 3 months notice.

On July 2, 1962, Mitford wrote to Robert de Lasala inquiring about the terms of his employment as they related to his leave pay. De Lasala responded on July 6, addressing Mitford's leave and indicating that "[i]n order to avoid any misunderstanding in the future," he would write to Mitford "officially on the matter." The official letter, dated July 7, 1962, and signed by Robert P. de Lasala, states in full:

### AUSTRALASKA CORPORATION

### COSMOPOLITAN DEVELOPMENT CORPORATION.

> I wish to refer to letter addressed to you by Mr. E.F. de Lasala on 27th September 1961 and would confirm that as from 2nd October 1961 you are employed as Treasurer of the above mentioned Corporations at a remuneration in lieu of a fixed salary based on 10% (ten percent) of profits as computed in accordance with the rules of Federal Income Tax but with a minimum guaranteed drawing allowance of US$850.- per month in all and in such proportion chargeable to each Corporation as the Directors might decide at the end of each financial year.

> The period of your employment is for an indefinite period subject to determination by either side giving three months notice.

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

For the sake of good order kindly confirm your understanding and acceptance by signing two copies of this letter.

Mitford signed this letter under the typewritten phrase "I HEREBY CONFIRM MY UNDERSTANDING AND ACCEPTANCE OF THE ABOVE."

Mitford, who became an officer and director of Australaska and Cosmopolitan, managed those corporations' real property holdings over the ensuing sixteen years, as well as property owned by Alaska Enterprises, Ltd., another defendant in this action. He additionally performed services for a group of other de Lasala owned corporations at the direction of either Robert or Ernest de Lasala. In 1971, he requested an increase in his drawing allowance, but the request was denied.

In 1977, Mitford reminded Ernest de Lasala, now presiding over the de Lasala corporate milieu since his father's death, of the 10% profit-sharing arrangement contained in his employment agreement. De Lasala responded by letter on October 7, 1977, indicating that he did "not recall the existence of the letter which is very ambiguous at best." De Lasala interpreted the employment agreement to give Mitford a choice between 10% of the profits in Alaska or a share in another venture in which Mitford had participated.

Mitford replied on October 19, 1977, with his interpretation of the employment agreement. He asserted that his subsequent participation in the other de Lasala venture was separate from the employment agreement, that all ambiguities in the employment agreement would be construed against de Lasala, and that since the profits were to be "computed in accordance with the rules of Federal Income Tax," each year of Mitford's employment must stand on its own. Accordingly, profits from later years could not be offset against drawing allowance payments of previous years.

On October 28, 1977, de Lasala again wrote to Mitford, stating:

Your most uncalled for letter 19/10/77 compels me to hereby give you three months' notice of termination of agreement as set out in letters 27/9/61 and 15/8/60.

On December 3, 1977, Mitford filed a complaint that named Ernest de Lasala, Australaska, Cosmopolitan, and Alaska Enterprises as defendants. The complaint alleged various breach of contract claims and asserted entitlement to 10% of the corporate defendants' profits. The defendants answered, admitting that Mitford was entitled to 10% of the profits of Australaska and Cosmopolitan as computed in accordance with the rules of federal income tax with a minimum guaranteed drawing allowance of $850 per month, and denying any other liability. Mitford later amended his complaint to name the remaining defendants in this action, as well as a partnership later dismissed by stipulation. The amended complaint alleged that each new defendant was an "affiliate" of Australaska, Cosmopolitan, and Alaska Enterprises, and was therefore liable to Mitford under his employment contract for 10% of their profits. The four original defendants answered as before, and the new defendants answered, denying any liability.

On October 4, 1979, Mitford amended his complaint again by leave of court. The second amended complaint alleged a right to compensation in quantum meruit from Ernest de Lasala, Alaska Enterprises, and Compass, and claimed that all defendants had prevented Mitford from collecting his share of the profits by firing him and by "prevent[ing]" profits from being realized" during his employment. All defendants denied any liability under these new claims.

A series of partial summary judgment rulings then disposed of the case. On June 15, 1979, Judge Mark Rowland ruled that the remuneration term of the employment agreement was unambiguous and

that plaintiff contracted to receive ten percent of the profits, as computed in accordance with the rules of Federal Income Tax with a minimum of $850.00 per month, of the defendant entities Cosmopolitan Development Corporation and Australaska Corporation only.

The court also ruled that the term relating to which defendants were liable for Mitford's remuneration was ambiguous and that summary judgment on that issue would be inappropriate on the state of evidence at that time. On January 24, 1980, Judge Rowland granted motions by Australaska and Cosmopolitan, finding that Mitford was not entitled to 10% of the unrealized appreciation of real estate owned by Australaska and Cosmopolitan. That same day, the court also granted summary judgment to the defendants on Mitford's quantum meruit and prevention claims. On September 2, 1981, the court ruled that Mitford's 10% of the profits of Australaska and Cosmopolitan would be "10% of the taxable income of the corporations as reported to the Internal Revenue Service," which amounted to $35,545.10. Only Australaska and Cosmopolitan were held liable for these damages.

The parties filed a Stipulation Respecting Remaining Issues on March 22, 1982, in order to perfect an appeal to this court. This stipulation left all parties free to move for an order determining the appropriate allocation of costs and attorneys' fees. The court later awarded attorneys' fees to all defendants as prevailing parties. Mitford appealed the original judgment on March 31, 1982, and later filed a brief regarding the attorneys' fees questions pursuant to order of this court.

## I

We must first determine the identity of Mitford's employers, whose profits he was to share, and who is liable to pay his remuneration.

■ The interpretation of this contract turns in part upon whether Mitford's employment agreement is integrated, as Compass alleges. According to Restatement (Second) of Contracts § 209(1) (1981):

> An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.

The question of integration is normally for the court. *Id.* comment c. In determining whether an agreement is integrated, the court seeks to determine whether the parties intended an integration. 4 S. Williston, A Treatise on the Law of Contracts § 633, at 1014 (W. Jaeger 3d ed. 1961). The court may resort to extrinsic evidence in determining whether an agreement is integrated. *Kupka v. Morey,* 541 P.2d 740, 747–48 (Alaska 1975); 3 A. Corbin, Corbin on Contracts § 573, at 360 (1960); Restatement (Second) of Contracts § 209 comment c (1981).

■ Although the question is a close one, we conclude that Mitford's employment agreement was not integrated and therefore that it consists of the letter of September 27, 1961 from Ernest de Lasala to Mitford, the letter of August 15, 1960 to Don Smith that was attached to the September 27 letter, and the letter of July 7, 1962 from Robert P. de Lasala to Mitford that Mitford signed. Since this case involves the review of summary judgment motions, we must construe the facts most favorably to Mitford, the losing party below. *Norman v. Nichiro Gyogyo Kaisha, Ltd.,* 645 P.2d 191, 192 n. 2 (Alaska 1982); *Frantz v. First National Bank of Anchorage,* 584 P.2d 1125, 1126 & n. 5 (Alaska 1978). The facts surrounding the drafting of the July 7 letter indicate that Mitford felt that the terms of his leave were unclear and had inquired about those terms. Although Robert de Lasala wrote to Mitford "officially on the matter" regarding the terms of his employment, the official July 7 letter did not necessarily constitute an integration. We believe that reference to the September 27 letter in the July 7 letter supports this conclusion. This reference "confirm[ing]" Mitford's employment as treasurer indicates to us that any terms in the September 27 letter that were at variance with the July 7 letter still had vitality in the agreement between the parties. The subsequent conduct of the parties bolsters this conclusion. There is no dispute that Mitford performed various services for Compass over his 16 years of employment in Anchorage. If the July 7 letter constituted the entire contract between the parties, then Mitford's sole employers would be Australaska and Cosmopolitan, and Mitford's subsequent perform-

ance of services for Compass would make no sense, as they would be performed outside the bounds of his contract. In addition, the termination letter written by Ernest de Lasala on October 28, 1977 does not refer Mitford to the July 7 letter, but instead gives "three months' notice of termination of agreement *as set out in letters 27/9/61 and 15/8/60.*" (Emphasis added.) Therefore, we believe that the July 7, 1962 letter did not constitute an integration of the agreement between the parties.

■ We consequently must proceed to interpret Mitford's employment agreement as contained in the three letters. In interpreting a contract, we seek to give effect to the reasonable expectations of the parties. *Peterson v. Wirum,* 625 P.2d 866, 872 n. 10 (Alaska 1981). The parties' reasonable expectations are assessed through resort to "the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions." *Id.* Relevant extrinsic evidence can include subsequent conduct of the parties. *Id.* at 870 n. 7. In reaching a reasonable interpretation of a contract, all contract terms should be given effect if possible. *Id.* at 872 n. 11. Our problem, then, is to interpret the contents of all three letters together, in a manner that will give effect to each contract term as well as the reasonable expectations of the parties.

■ The first question involves the identity of Mitford's employers. Mitford alleges that he was employed by all corporate defendants. Australaska and Cosmopolitan admit that they employed Mitford. Compass denies employing Mitford. We believe that reading all three letters together, those corporations for whom Mitford was to perform services included Australaska, Cosmopolitan, "and their affiliates," as stated in the letter of September 27, 1961. These "affiliates" include all corporate defendants other than Australaska and Cosmopolitan, including those collectively referred to in this opinion as Compass. The letter of September 27 clearly refers to "affiliates" of Australaska and Cosmopolitan. In addi-

tion, we believe that the reference in the July 7, 1962 letter to the September 27 letter, along with Mitford's subsequent performance of services for Compass, indicate an intent that he was to perform services for corporations other than Australaska and Cosmopolitan.

■ The next question is whose profits Mitford was to share. Mitford alleges that he was to share in the profits of all corporate defendants. Australaska and Cosmopolitan have admitted that he has a right to 10% of their profits. Compass contends that Mitford has no claim to a share of their profits. We hold that the three letters taken together indicate that Mitford has a right to 10% of the profits of Australaska and Cosmopolitan only, and thus that the summary judgment in this respect must be affirmed. The September 27, 1961 letter referred Mitford to the letter of August 15, 1960 to Don Smith, and stated that Mitford's employment was "on the same terms and conditions" as Smith. The letter to Smith indicated that he was "Secretary of the said Corporations [Australaska and Cosmopolitan] . . . ." Smith was to receive "a remuneration in lieu of a fixed salary based on 10% . . . of profits . . . in such proportion chargeable to *each Corporation* as the Directors might decide . . . ." (Emphasis added.) Smith thus clearly was to share in the profits of Australaska and Cosmopolitan. If Mitford's employment was to be on the same terms as Smith, then he likewise would share in the profits of Australaska and Cosmopolitan. This reading is confirmed by the July 7, 1962 letter. That letter indicates that Mitford was "employed as Treasurer of the above mentioned Corporations [Australaska and Cosmopolitan] at a remuneration in lieu of a fixed salary based on 10% . . . of profits . . . in such proportion chargeable to *each Corporation* as the Directors might decide . . . ." (Emphasis added.) This wording echoes that of Smith's contract. The words "each Corporation" obviously refer to Australaska and Cosmopolitan, as those are the only corporations mentioned in the July 7 letter. As a result, although Mitford was to work for all

the corporate defendants, his remuneration was to reflect only the profits of Australaska and Cosmopolitan.

■■■■ We finally determine which of the defendants is liable to compensate Mitford. Given the analysis in the preceding paragraph, we have little trouble in determining that only Australaska and Cosmopolitan are liable for Mitford's compensation. Again, both Smith's contract and the July 7, 1962 letter refer to the profits being "chargeable to *each Corporation* . . ." (emphasis added), and each letter refers only to Australaska and Cosmopolitan. Thus although Mitford was to perform services for Compass, only Australaska and Cosmopolitan are liable for his remuneration.[1]

## II

We next address the issue of prevention. In his second amended complaint, Mitford alleged that his termination prevented him from collecting his share of the defendants' profits. The court granted summary judgment to Australaska, Cosmopolitan, de Lasala, and Alaska Enterprises on the prevention claim. We reverse the summary judgment and remand for further proceedings as to Australaska and Cosmopolitan.

Restatement (Second) of Contracts § 205 (1981) provides:

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance or its enforcement.

The prevention doctrine is subsumed in this duty under the view of the new Restatement. *Id.* comment d (among judicially recognized types of bad faith is "interference with or failure to cooperate in the other party's performance").

We have recognized the duty of good faith and fair dealing in another context.

In *Guin v. Ha,* 591 P.2d 1281 (Alaska 1979), we stated:

> In *every* contract, including contracts of insurance, there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

*Id.* at 1291 (emphasis added, footnote omitted); *see also Fairbanks Builders, Inc. v. Morton De Lima,* 483 P.2d 194, 195 (Alaska 1971).

Several courts recently have implied a covenant of good faith and fair dealing into at-will employment contracts similar to Mitford's employment contract. One case similar to the one at bar is *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). Fortune, who was 61 years old, was employed by the National Cash Register Company (NCR) under a written salesman's contract. The contract provided that it was terminable at will and without cause by either party. In addition to a fixed salary, Fortune was to receive commissions on sales in his assigned territory, whether the sales were made by him or by someone else. *Id.* 364 N.E.2d at 1253. A customer in Fortune's territory signed a sales contract directly with NCR. On the order form, NCR indicated that Fortune was to be the "salesman credited" with a bonus of $92,079.99. *Id.* 364 N.E.2d at 1254. However, Fortune was terminated by letter dated the first working day after the order was obtained. At this point in time, Fortune had worked for NCR for nearly 25 years. Fortune stayed on for some eighteen months and received some bonus payments, but was finally fired without receiving the total of the bonus payments credited to him on the order form. *Id.*

The Supreme Judicial Court of Massachusetts noted that under the literal terms of

---

1. Our holding that only Australaska and Cosmopolitan are liable to compensate Mitford disposes of Mitford's claim to quantum meruit recovery from Compass and Alaska Enterprises. We have determined that these defendants were parties to the contract as employers. It is well settled that proof of an express contract covering the services in question precludes relief in quantum meruit. *Cole v. Benavides,* 481 F.2d 559, 561 (5th Cir.1973); *B.B. & S. Construction Co. v. Stone,* 535 P.2d 271, 275 n. 8 (Alaska 1975); *Lemoge Elec. v. County of San Mateo,* 46 Cal.2d 659, 297 P.2d 638, 641 (1956); *Keneally v. Orgain,* 606 P.2d 127, 129 (Mont. 1980). The summary judgment on this issue is affirmed.

Fortune's contract, he had received all bonus payments due him. *Id.* 364 N.E.2d at 1255. Nonetheless, the court held

> that NCR's written contract contains an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of contract.
>
> . . . .
>
> [W]e believe that where, as here, commissions are to be paid for work performed by the employee, the employer's decision to terminate its at will employee should be made in good faith.

*Id.* 364 N.E.2d at 1255–56. In upholding a jury verdict for Fortune, the court later stated:

> We think that the evidence and the reasonable inferences therefrom support a jury verdict that the termination of Fortune's twenty-five years of employment as a salesman with NCR the next business day after NCR obtained a $5,000,000 order from First National was motivated by a desire to pay Fortune as little of the bonus credit as it could.

*Id.* 364 N.E.2d at 1258. The court therefore concluded that the jury could properly have found bad faith in Fortune's termination. *Id.*

In *Maddaloni v. Western Massachusetts Bus Lines, Inc.,* 386 Mass. 877, 438 N.E.2d 351 (1982), Maddaloni, who was also employed under an incentive contract, was told that he was being discharged in part because he insisted on receiving his commissions pursuant to his contract. *Id.* 438 N.E.2d at 354. The court stated that

a discharge to avoid payment of commissions is a discharge in bad faith. An employer may not discharge an employee in order to avoid the payment of commissions or to reap for itself financial benefits due its employee.

*Id.* 438 N.E.2d at 356.[2]

We agree with the reasoning in these opinions and hold that Mitford's employment contract contained an implied covenant of good faith and fair dealing. In particular, good faith and fair dealing in this case would prohibit firing Mitford for the purpose of preventing him from sharing in future profits of Australaska and Cosmopolitan. The circumstances surrounding Mitford's termination give rise to an inference that he was fired for that reason. After Mitford reminded de Lasala of his 10% profit-sharing arrangement, de Lasala demurred concerning the contract's existence and asserted that it was ambiguous. Mitford replied to de Lasala's interpretation of the contract, again asserting his profit-sharing rights, and was thereupon terminated.

We note that although a summary judgment motion was made on the prevention issue, it did not precisely address the good faith and fair dealing issue. Australaska and Cosmopolitan should have an opportunity to offer evidence, if it exists, tending to rebut the inference of bad faith that arises from the facts before us. We reverse the summary judgment on the prevention issue[3] and remand for further proceedings.[4]

---

2. For other cases implying a covenant of good faith and fair dealing in the employment context, *see Zimmer v. Wells Management Corp.,* 348 F.Supp. 540 (S.D.N.Y.1972); *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980). *See generally* Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv.L.Rev. 1816 (1980).

3. We note that because summary judgment was entered against him, Mitford never completed discovery in this area. On remand, further discovery regarding the circumstances surrounding the reasons underlying Mitford's termination is appropriate.

4. Should Mitford ultimately establish that his termination breached the covenant of good faith and fair dealing, the question of appropriate damages will arise. We believe that should Mitford prevail, the only practical measure of damages in this case would require that property owned by Australaska and Cosmopolitan be valued as of January 28, 1978, the date of Mitford's termination. Mitford would then receive 10% of the appreciation of the value of the property over the original investment. To require that profits actually be realized before Mitford's damages could be determined would place him at the mercy of his former employers, who could choose never to sell the property. *Cf. Maddaloni v. Western Mass. Bus Lines,*

### III

Finally, we must address the issue of attorneys' fees. Mitford appeals the award of attorneys' fees to all defendants as prevailing parties.[5]

 First, since we have affirmed the grant of summary judgment to Compass on the quantum meruit theory and have held that it is not liable for Mitford's remuneration, we hold that Compass remains a prevailing party. Accordingly, the award of costs and attorneys' fees to Compass is affirmed.

 Second, since further proceedings between Mitford and Australaska and Cosmopolitan are necessary with regard to the good faith and fair dealing issue, the award of attorneys' fees to Australaska and Cosmopolitan must be vacated. We note that the award below was to Australaska, Cosmopolitan, Ernest de Lasala, and Alaska Enterprises. We have found no liability attaching to the latter two defendants. On remand, if these two defendants can show that the time that their counsel has spent to this point on this case can be segregated to reflect services rendered solely in their behalf, an award of attorneys' fees to them as prevailing parties pursuant to Civil Rule 82(a)(2) would be appropriate.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

CONNOR, J., not participating.

*Inc.*, 386 Mass. 877, 438 N.E.2d 351, 355 n. 6 (1982) (plaintiff's damages measured by "the fair amount of commissions that he could reasonably be expected to earn during his employment by the defendant ...").

**5.** Alaska R.Civ.P. 82.