**William J. RUTLEDGE, Appellant and Cross-Appellee,**

v.

**ALYESKA PIPELINE SERVICE COMPANY, Appellee and Cross-Appellant.**

Nos. S-1096, S-1128.

Supreme Court of Alaska.

Nov. 14, 1986.

Lee Holen, Johnson and Holen, Anchorage, for appellant and cross-appellee.

Lawrence R. Trotter, Robert I. Shoaf, Alyeska Pipeline Service Co., Kenneth P. Eggers and Sema E. Lederman, Groh, Eggers & Price, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This appeal arises from a wrongful termination action filed by William Rutledge against Alyeska Pipeline Service Company (Alyeska). Rutledge appeals from both the trial court's refusal to allow him to amend

his complaint, and the grant of directed verdicts to Alyeska on a number of his claims. We affirm the trial court on all issues.

## I. FACTS AND PROCEEDINGS BELOW

### A. *Facts*

On October 4, 1982, Rutledge was working the night shift in an Alyeska control room. Rutledge had the window of the control room open, but Crewman Mike Overson closed the window because he was cold. Later, Overson began to light a cigarette. Rutledge told Overson that he could not smoke since he had closed the window, so Overson reopened the window. An argument ensued. Rutledge claims that Overson made a hostile movement toward him and, to defend himself, he put Overson in a restraint hold.

During the struggle, Overson was thrown to the ground, and he claims he almost passed out twice for lack of oxygen. Overson also claims that Rutledge banged Overson's head into the wall three or four times and forced him to promise not to smoke in the room. Rutledge does not deny that the altercation occurred and that he restrained Overson on the floor.

After Rutledge released Overson, they exchanged words. Overson then went to another part of the plant and called Supervisor Bill Daley. Daley went to see Overson and heard his story. Overson was writing his version of the incident when Daley arrived. After speaking with Overson, Daley went to see Rutledge. Rutledge did not deny the event and admitted that he lost his temper.

Daley then met with both Overson and Rutledge. After speaking with them, Daley concluded that a possible solution would be to transfer Rutledge to another shift. This seemed to satisfy both men. Since Daley did not have the authority to order a transfer, he called his supervisor, Larry Planje, to discuss the situation. Daley and Planje had a lengthy conversation concerning possible transfers. Most of that discussion was repeated to Rutledge

and Overson by Daley during the course of the telephone conversation. Daley testified that he told Planje during that conversation that Rutledge would not be surprised should other discipline be imposed. Daley then had both men finish their shifts. The crew was at the end of a week on and had a week off before returning to duty. Rutledge left believing that he would be reassigned to another shift when he returned to work the following week.

The day after the fight, Planje read two reports of the incident, one from Daley and one from Overson. He decided that the altercation was more serious than he originally thought. He took the written reports to the plant's employee relations specialist, Virginia Hatch. Two days after the incident, on October 6, Rutledge was called into the office for a meeting with Planje and Hatch to give his version of the altercation. Overson was also called in to give his version of the event. He had little to add to his written report.

In addition to recounting the events of October 4, Overson's report also discussed a prior unreported incident between Rutledge and another Alyeska employee, Tom Archer. This was Alyeska's first knowledge of this earlier incident. Hatch and Planje contacted Alyeska's labor relations specialist in Anchorage, Kathleen Carr, to discuss the October 4 altercation and related the information about the earlier incident.

Hatch and Planje also notified Earl Boling, Alyeska's terminal superintendent, who met with them to discuss the problem. After recommendations from Hatch and Planje, as well as consultations with Carr, Boling decided to terminate Rutledge. On October 8, Boling sent Rutledge a termination letter. In it he indicated that since the investigation had determined that Rutledge was the aggressor in the altercation and since fighting was in violation of Alyeska's published company rules, the company must terminate him.

Dissatisfied with the termination, Rutledge requested a personal meeting with Boling. Rutledge met with Boling, Planje

and Hatch one week after the altercation. At that meeting Rutledge submitted a letter to Boling outlining his complaints regarding the investigation and giving his version of the incident. In the letter, Rutledge protested the change in the discipline imposed from a change in shifts to termination. Rutledge also met with Boling privately after the group meeting concluded. He alleged that the investigation had not been conducted impartially and requested an independent third party investigator. Boling took the matter under advisement and subsequently consulted Carr in Anchorage. No change was made in the termination decision. Rutledge ultimately appealed his dismissal to the president of Alyeska, but he was again unsuccessful.

### B. *Proceedings in the Superior Court*

On September 14, 1983, Rutledge sued Alyeska for wrongful discharge, reverse race discrimination, failure to provide a safe workplace, failure to protect him from assault, and breach of the agreement to transfer (which is characterized as a separate employment contract). Superior Court Judge Milton M. Souter issued a pretrial order on December 6, 1984. The order limited the time for motions to amend the pleadings to 180 days before trial.

On February 28, 1985, Rutledge moved to amend his complaint to include an action for interference with prospective employment. The motion was accompanied by a memorandum alleging that, at the time the original complaint was filed, Rutledge was unaware that Alyeska was actively interfering with his ability to obtain alternate employment. On the same day, Alyeska moved for summary judgment on all allegations.

On May 30, 1985, Rutledge's motion to amend was denied without comment. The trial court also granted Alyeska's summary judgment motion on the unsafe workplace and failure to protect charges. The case proceeded to trial before Judge Souter on June 17, 1985, on the wrongful termination, breach of contract, and reverse race discrimination claims. Rutledge sought both compensatory and punitive damages.

At the close of Rutledge's case, Judge Souter directed a verdict for Alyeska on all but the wrongful termination claim. At the close of Alyeska's case, Judge Souter directed a verdict for Alyeska on the termination claim.

Rutledge appeals from each of these adverse rulings. Specifically, he argues that the trial court erred in not granting his motion to amend; in holding as a matter of law that no employment contract arose out of the agreement to transfer; in denying him a jury verdict on the termination issue when there were disputed factual allegations; and in directing a verdict on the punitive damages issue.

## II. DISCUSSION

### A. *The Trial Court Correctly Denied Rutledge's Motion to Amend His Complaint*

Rutledge moved to amend his complaint on February 28, 1985, to include a cause of action for interference with prospective employment opportunities after his termination. He argues that Alaska Civil Rule 15(a) governs amendments to pleadings.[1] In discussing the identical federal rule, Professors Wright and Miller indicate that the purpose of Rule 15(a) "is to enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint or answer." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1473, at 375 (1971) (footnote omitted) (hereinafter "Wright & Miller"). Rutledge argues that

---

1. Rule 15(a) provides:
   A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. *Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.* (Emphasis added).

the amendment should have been allowed since he was unaware of Alyeska's interference at the time the complaint was filed. Alyeska asserts that Rutledge's amendment is actually a supplemental pleading and therefore Civil Rule 15(d) should apply. Rule 15(d) provides that, with the consent of the court, a party may supplement its original pleading to set forth "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Rule 15(d), like Rule 15(a), attempts to provide as complete an adjudication of claims as possible. 6 Wright & Miller § 1504, at 536. "The rule is somewhat narrower in scope than its predecessor, Equity Rule 34, because *it does not expressly apply to protection matters of which a party was ignorant at the time he interposed his original pleading (these matters may be raised under Rule 15(a))* but embraces only events that have happened 'since the date of the pleading sought to be supplemented.'" *Id.* (quoting Rule 15(d)) (emphasis added).

For Rule 15(a) to apply, Rutledge must have been unaware that Alyeska was actively interfering with his prospective employment at the time the complaint was filed. The record does not, however, establish when the alleged interference occurred. In his motion to amend the complaint Rutledge alleges that he was unaware that Alyeska was actively interfering with his employment prospects at the time the complaint was filed.[2] He does not state whether the interference occurred before the complaint was filed.

■ Regardless of the timing of the alleged actions, the trial court has broad discretion in allowing or denying proposed amendments after the initial period has passed under either Rule 15(a) or 15(d). *Shooshanian v. Wagner,* 672 P.2d 455, 458 (Alaska 1983); *Wright v. Vickaryous,* 598 P.2d 490, 495 (Alaska 1979). We will only

interfere with that discretion when it has been abused. *Shooshanian,* 672 P.2d at 458; *Merrill v. Faltin,* 430 P.2d 913, 915 (Alaska 1967).

■ In ascertaining whether to grant a motion to amend, the trial court must assess whether the nonmoving party will be prejudiced. We have recognized that "prejudice can result from the opposing party being put to an added expense, a more burdensome and lengthy trial, or if the issues being raised in the amendment are remote from the scope of the original case." *Estate of Thompson v. Mercedes-Benz,* 514 P.2d 1269, 1271 (Alaska 1973) (footnote omitted) (discussion of Rule 15(a)).

Alyeska alleged in its opposition to the motion to amend that it would be "prejudiced by being put to the added expense of engaging in additional extensive discovery." It also contended that it would be "further prejudiced by a more burdensome and lengthy trial involving facts and circumstances not a part of the original Complaint." Finally, it argued that it would be prejudiced by using trial preparation time to conduct further discovery. It renews these arguments on appeal.

Judge Souter gave no reasons for his denial of Rutledge's motion to amend. Therefore, we have independently examined the grounds Alyeska presents to ascertain whether Judge Souter abused his discretion by denying Rutledge's motion. We conclude that Judge Souter acted within his discretion.

■ While delay alone is insufficient to deny a motion to amend,[3] here, the potential for delay is accompanied by a claim which is only tangentially related to Rutledge's initial complaint. The interference claim is unrelated to the *facts* surrounding Rutledge's dismissal. It was only after his termination that Alyeska allegedly contact-

2. His memorandum in support of his motion states:

Since his original action was filed, Plaintiff WILLIAM J. RUTLEDGE has learned that ALYESKA PIPELINE SERVICE COMPANY has told future employers that he is a trouble maker with a long history of fighting.

3. 3 J. Moore, *Moore's Federal Practice* ¶ 15.08[4] at 15–71 & n. 6 (1985).

ed prospective employers. The evidence necessary to prove this claim is vastly different than the evidence relevant to the wrongful discharge claim. Therefore, we find that Alyeska would have been prejudiced by allowing the amendment.

A finding of prejudice, however, does not end the inquiry. Once the trial court determines that prejudice will result, it must balance the interests of both parties before reaching a final decision. The court must "weigh[ ] the degree of prejudice to the opposing party against the hardship to the movant if the amendment is denied." *Shooshanian,* 672 P.2d at 458. On balance, the probability of a more lengthy trial involving different factual and legal issues and the necessity for more extensive discovery outweigh Rutledge's need to try these claims together.

### B. *The Trial Court Correctly Granted a Directed Verdict for Alyeska on the Alleged Breach of Contract Action*

Rutledge alleges that Judge Souter erred by granting a directed verdict in favor of Alyeska on the question of whether a contract was created when Daley and Planje discussed the transfer of Rutledge to another shift.

The standard for determining the appropriateness of a directed verdict is the same in this court as in the trial court. 9 Wright & Miller § 2524, at 541–42. Our role "is not to weigh conflicting evidence or judge ... the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable [persons] could not differ in their judgment." *Holiday Inns of America v. Peck,* 520 P.2d 87, 92 (Alaska 1974); *see also Knight v. American Guard & Alert,* 714 P.2d 788, 793 (Alaska 1986); *Bubbel v. Wien Air Alaska,* 682 P.2d 374, 376–77 (Alaska 1984); *City of Fairbanks v. Nesbett,* 432 P.2d 607, 609 (Alaska 1967).

■ Judge Souter, in directing a verdict on this issue for Alyeska, held that there was not adequate consideration for the alleged agreement. He highlighted three acts which may constitute consideration for a new contract. First, Rutledge's agreement to complete his shift the night of the incident; second, Rutledge's agreement to a shift transfer; and third, his agreement to stay away from Overson. Judge Souter rejected each of these as a basis for a new contract, since each were a part of Rutledge's preexisting duty as an employee of Alyeska.

Furthermore, none of the elements necessary to the formation of a contract are present. There is also no evidence that Alyeska ever assented to a transfer in exchange for Rutledge finishing his shift or staying away from Overson. No employment contract arose during the discussion of possible transfers. While transfer was certainly discussed, Planje made no final decision on the night of the incident. Instead he requested that Daley submit a report of the incident to Planje the next day. Daley believed that some sort of discipline "would not be unexpected" by Rutledge. Judge Souter's assessment of Rutledge's preexisting duty to finish his shift and to stay away from Overson was correct. He appropriately directed a verdict for Alyeska on this issue.

### C. *The Trial Court Correctly Granted a Directed Verdict for Alyeska on the Wrongful Termination Claim*

Rutledge argues that the trial court erred by directing a verdict for Alyeska on his wrongful termination claim, particularly where Alyeska bore the burden of proving just cause for the termination.[4] Alyeska contends that a directed verdict was appropriate because the court found that fighting was a just cause for termination and that Alyeska's primary reason for terminating was the fighting.

Again, a motion for directed verdict should only be granted when reasonable

4. Alyeska has cross-appealed on the burden of proof issue. We need not address the merits of

its cross appeal in light of our disposition of this case.

jurors, viewing the evidence in the light most favorable to the nonmoving party, could not differ in their judgment. *Knight,* 714 P.2d at 793; *Bubbel,* 682 P.2d at 376–77. The trial court determined that Alyeska had the burden of proving just cause. *Skagway City School Bd. v. Davis,* 543 P.2d 218, 222 (Alaska 1975), *disapproved of on other grounds, Native Alaskan Reclamation and Pest Control v. United Bank Alaska,* 685 P.2d 1211 (Alaska 1984). Directed verdicts are rarely granted to the party bearing the burden of persuasion. 5A J. Moore, *Moore's Federal Practice* § 50.02[1] at 50–31 to 50–32 (1985); *see also Wilson v. United States,* 530 F.2d 772, 777 (8th Cir.1976); *Grey v. First National Bank,* 393 F.2d 371, 380 (5th Cir.1968), *cert. denied,* 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). We believe, however, that this was an appropriate case in which to grant a directed verdict for Alyeska on the wrongful termination issue.

We have recognized at least two theories under which an employee can recover for wrongful termination. *Knight,* 714 P.2d at 792.[5] In *Eales v. Tanana Valley Medical-Surgical Group,* 663 P.2d 958 (Alaska 1983), we recognized that certain employment contracts for an indefinite term were terminable by the employer only for good cause. And in *Mitford v. de Lasala,* 666 P.2d 1000, 1006–07 (Alaska 1983), we recognized an implied covenant of good faith and fair dealing in all at-will employment contracts. *Id.*

■ In his complaint, Rutledge alleged that he was terminated "without justifiable cause." Alyeska's employee handbook, given to all employees on hire, indicates that no terminations will occur without cause. In the handbook Alyeska states that terminations can occur for one of three reasons: poor performance, economic necessity, or cause. Cause is defined as "including but not limited to dishonesty, theft, flagrant insubordination, or deliber-

ate disregard for Company rules and regulations." Fighting on Alyeska property is included in the list of company rules. This handbook is important because, while courts have held that there is not a uniform right to just cause for termination, *Gram v. Liberty Mutual Insurance,* 384 Mass. 659, 429 N.E.2d 21, 28 & n. 9 (1981), it is well recognized that where employers indicate that termination will only occur for cause, they must comply or be liable for damages. *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880, 892 (1980).

All of the testimony and correspondence regarding Rutledge's termination indicates that Alyeska discharged him because it determined that Rutledge was the instigator in the altercation with Overson. Alyeska's company rules expressly state that discipline, including termination, will result from fighting on Alyeska property. The trial court correctly determined that reasonable jurors must conclude that Rutledge fought on company property and that fighting was a terminable offense.

■ Rutledge also alleges that the trial court erred in refusing to allow evidence of Alyeska's previous discipline in prior incidents of fighting. Such evidence would have been relevant as tending to show a breach of the covenant of good faith and fair dealing. *Toussaint,* 292 N.W.2d at 897; *Rulon-Miller v. I.B.M.,* 162 Cal. App.3d 241, 208 Cal.Rptr. 524, 529 (1984) (duty of employer to treat like cases alike). However, Rutledge offered the evidence only to prove a reverse race discrimination claim. The trial court dismissed that claim after Rutledge failed to introduce any evidence to show that Overson was a member of a protected group.

Alaska Rule of Evidence 103(a) provides that "[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected; and (2) ... the substance of the evidence was made known to the court by offer."

---

**5.** In *Knight* we also indicated that a "public policy" theory of recovery adopted by some courts seems to be "largely encompassed within the implied covenant of good faith and fair dealing." 714 P.2d at 792.

While evidence of the treatment of similar incidents by Alyeska may have been the key to Rutledge's wrongful termination action, that evidence was only offered to prove the erroneous reverse race discrimination claim. "[A] purpose not identified at the trial level will not provide a basis for reversal in appeal." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* § 103[03] at 103–30 to 103–31 (1986). Therefore, evidence of prior incidents of fighting and the resulting discipline was appropriately excluded.

## III. CONCLUSION

The trial court appropriately directed verdicts for Alyeska on the wrongful termination and breach of contract claims. Since no underlying cause of action exists, it is unnecessary for us to reach the appropriateness of the directed verdict on punitive damages. The trial court did not abuse its discretion by refusing to allow Rutledge to amend his complaint prior to trial. Therefore, this case is AFFIRMED.