John J. KAISER, Appellant,

v.

ROYAL INSURANCE CO.
OF AMERICA, et al.,
Appellees.

No. S–10703.

Supreme Court of Alaska.

March 19, 2004.

Before: BRYNER, Chief Justice,
EASTAUGH, FABE, and CARPENETI,
Justices.

### Order

IT IS ORDERED:

■ 1. This appeal involves a workers' compensation recipient's claim for reimbursement of his medical bills relating to his back surgery. John Kaiser filed a complaint with the Alaska Workers' Compensation Board disputing his insurance carrier's controversion of any medical benefits related to his surgery. Kaiser argued that his Compromise and Release (C & R) should be set aside; that the insurance carrier interfered with and improperly influenced the care provided by his attending physician; that his surgery expenses should be reimbursed; and that penalties and interest should be imposed for the carrier's late payment of an MRI. The Alaska Workers' Compensation Board did not address the issue whether the C & R should be set aside but denied the other three claims. Because the validity of the C & R is a threshold determination that should be considered before Kaiser's other claims can be addressed, we HEREBY STAY all

claims on appeal—with the exception of the claim of interference, which we REMAND for further findings—until there is a determination of whether the C & R should be set aside.

2. At a hearing held on September 20, 2000, the Alaska Workers' Compensation Board elected to proceed to consider several of Kaiser's claims, including his assertion that his surgery should be reimbursed, before deciding the question whether to set aside the C & R. The Board rendered its decision on the reimbursement claims on October 3, 2000, but apparently did not ever hold a hearing or reach a decision on the validity of the C & R. Kaiser argues on appeal that the C & R was not in his best interest and that statements in support of the C & R constituted fraud on the Board. He also claims that he approved the settlement under duress. Under AS 23.30.012 the Board may approve a settlement if it "appears to be [in] the best interest of the employee." [1] Kaiser alleges that significant discrepancies exist within the terms and language of the C & R that call into question whether the settlement was in his best interest. For example, he argues that the settlement waived Kaiser's entitlement to a pain management clinic when nearly all of the doctors, including Dr. Swift, Dr. Ohlson, Dr. Mihayl, and Dr. Smith, recommended that Kaiser receive pain management treatment or further evaluation for pain management. Kaiser further contends that he did not want to waive pain management and that it was the insurance carrier that sought to exclude it from his settlement. He points to a letter dated October 17, 1997, six months before the signing of the C & R, in which he specifically requested to preserve his entitlement to a pain clinic. He also notes that prior to that letter, Dr. Ohlson and Dr. Mihayl urged, on Kaiser's behalf, that the insurance carrier allow Kaiser to be treated at a pain clinic. Kaiser contends that in light of his clear expression of willingness to receive pain management, the C & R's language stating that "the employee does not wish to attend" a "chronic pain program or pain clinic" is a misrepresentation. Kaiser further maintains that his agreement to the C & R was obtained under duress, emphasizing that the insurance carrier withheld his weekly disability benefits and medical compensation for over a year until he was willing to agree with the carrier on the final terms of the C & R. The insurance carrier has not responded to any of Kaiser's appellate arguments to set aside the settlement because that issue has not yet been litigated before the Board. We REMAND for further fact-finding and a determination of whether the C & R should be set aside before we decide the dependent issues regarding Kaiser's right to reimbursement under the terms of the C & R.

1. Although we express no view at this point concerning the meaning and scope of the best interest provision of AS 23.30.012, we note that other jurisdictions with similarly worded statutory provisions requiring that the settlement comport with the "employee's best interests" have determined that lump sum settlements are generally disfavored or that they should be provided in exceptional circumstances. *Bailey v. Colonial Freight Sys., Inc.* 836 S.W.2d 554, 557 (Tenn. 1992); *Codling v. Aztec Well Servicing Co.*, 89 N.M. 213, 549 P.2d 628, 630–32 (N.M.App.1976). Alabama courts have determined that the trial judge should make a specific finding on the record that the settlement is in the employee's best interest, and, if the trial judge does not specifically make such a finding, then the record must affirmatively show that the settlement is in the employee's best interest. *Ex parte Ford,* 782 So.2d 185, 186–87 (Ala.2000) (citing *Shaw v. Dover Furniture Mfg. Co.,* 700 So.2d 1382, 1384–85 (Ala.Civ.App.1997).) In Tennessee, a trial judge is also required to make a careful inquiry into the facts and circumstances and the burden is on the worker to establish that a lump sum is in his or her "best interest" and that the worker is capable of "wisely managing and controlling the commuted award." *Bailey v. Colonial Freight Sys., Inc.* 836 S.W.2d 554, 557 (Tenn. 1992) (citing *North Am. Royalties, Inc. v. Thrasher,* 817 S.W.2d 308, 310–11 (Tenn.1991)). The Iowa Supreme Court has considered four factors in determining the employee's best interest:

1) The worker's age, education, mental and physical condition, and actual life expectancy (as contrasted with information provided by actuarial tables); 2) The worker's family circumstances, living arrangements, and responsibilities to dependents; 3) The worker's financial condition, including all sources of income, debts and living expenses; 4) The reasonableness of the worker's plan for investing the lump sum proceeds and the worker's ability to manage invested funds or arrange for management by others (for example, by a trustee or conservator).

*Dameron v. Neumann Bros., Inc.,* 339 N.W.2d 160, 164 (Iowa 1983).

3. We also REMAND to the Board for further findings and conclusions on the question whether the insurance carrier interfered with and improperly attempted to influence Kaiser's treating physician, retaining jurisdiction of this matter so that we may assess it in light of the ruling on the issue of the C & R's validity. If the C & R is set aside, all dependent claims are consequently mooted. If the C & R remains intact, we will proceed to consider any points of dispute concerning whether any interference by the carrier with the treatment provided by Kaiser's treating physician was a violation of the implied covenant of good faith and fair dealing. An implied covenant of good faith and fair dealing exists in all contracts and requires that each contracting party refrain from doing anything that would injure the right of the other party to receive the benefits of the agreement.[2] Once an employer's insurance carrier enters into a settlement agreement with an employee, the carrier becomes bound by the settlement, and any authority the carrier might otherwise have to communicate with the employee's physician may become substantially restricted by the carrier's contractual duty to comply with the express or implied terms of the agreement.[3] If the insurance carrier takes direct action to deprive the employee of the benefit of the settlement bargain, this interference could amount to a violation of the implied covenant of good faith and fair dealing.[4]

4. The Board's October 3, 2000 decision determined only that Dr. Peterson's treatment recommendation "was based on his evaluation of the employee's medical needs, not on the terms of the employee's settlement of his workers' compensation benefits." The Board's decision did not address whether the carrier improperly influenced Kaiser's attending physician or whether the carrier *attempted* to improperly influence Kaiser's attending physician in contravention of the implied covenant of good faith and fair dealing. Kaiser alleges that the carrier interfered with his relationship with his attending physician, Dr. Peterson, by providing Dr. Peterson with inaccurate information concerning the C & R and attempting to influence his referrals. According to Kaiser, Dr. Peterson notes in his report that the insurance carrier informed him that it "settled with [Kaiser] several years ago and gave him about $80,000. Their understanding was that this was to be used for inpatient pain management services." Kaiser also points to a letter, dated November 12, 1998, in which the insurance carrier questioned Dr. Peterson about his view that Kaiser should receive a referral to see Dr. Knight, an orthopedic surgeon in Seattle, for a second opinion regarding surgery. As Kaiser sets forth, the attorney for the insurance carrier then sent Dr. Knight an overnight express letter summarizing Kaiser's medical history before Kaiser's upcoming appointment with Dr. Knight despite knowledge that Dr. Peterson had already forwarded to Dr. Knight a recent discography, MRI results, and all other information relevant to the evaluation that suggested surgery may be appropriate. On remand, the Board should conduct further fact-finding on whether the carrier improperly influenced or attempted to improp-

---

**2.** *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997) (citing *Revelle v. Marston*, 898 P.2d 917, 926 (Alaska 1995); *Mitford v. de Lasala*, 666 P.2d 1000, 1006 (Alaska 1983); *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979).)

**3.** We do not currently address the extent to which the carrier's authority to communicate with the physician becomes more restricted after a settlement agreement but we take note of the decisions of other jurisdictions on this issue. In a workers' compensation case in which a chiropractor alleged that the insurance carrier interfered and improperly influenced the physician-patient relationship, the New Mexico Court of Appeals determined that rights injured by interference with an existing contract are more readily protected than if the contract is only prospec-

tive. *Speer v. Cimosz*, 97 N.M. 602, 642 P.2d 205, 209 (N.M.App.1982) (citing *Anderson v. Dairyland Ins. Co.*, 97 N.M. 155, 637 P.2d 837 (1981)). In consideration of a patient's right to receive treatment without interference from the insurer, an Ohio federal district court has determined, "[w]hen an ailing person selects a physician to treat him, he does so with the full expectation that such physician will do his best to restore him to health, and the contract into which they enter is deserving of more attention from the law than a businessman's expectation of profit from a purely commercial transaction." *Hammonds v. Aetna Cas. & Sur. Co.*, 3 Ohio Misc. 83, 237 F.Supp. 96, 101 (1965).

**4.** *See Guin*, 591 P.2d at 1291.

erly influence Kaiser's treating physician and whether the carrier's conduct violated the implied covenant of good faith and fair dealing.

Entered at the direction of the court.

MATTHEWS, J., not participating.