**KLONDIKE INDUSTRIES CORPORA-TION and Wiley F. Beaux, individually, Appellants and Cross-Appellees,**

v.

**Myles F. GIBSON and Bernice Gibson, husband and wife, Appellees and Cross-Appellants.**

Nos. S–1348, S–1432.

Supreme Court of Alaska.

Aug. 14, 1987.

As Amended on Denial of Rehearing Oct. 6, 1987.

A. William Saupe, Baily & Mason, Anchorage, for appellants/cross-appellees.

R.R. DeYoung, Wade & DeYoung, Anchorage, for appellees/cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Appellees Myles F. "Pat" and Bernice Gibson were employed as resident managers of a resort hotel by appellants Klondike Industries Corporation (KIC) and Wiley Beaux, its sole shareholder.[1] The Gibsons' employment contract provided that they would receive a large bonus upon the sale of the hotel on the condition that they were employed when it sold. However, the Gibsons resigned before the hotel was sold.

The Gibsons sued to obtain the bonus on the ground that Beaux had breached the implied duty of good faith and fair dealing in his employment contract with them by taking actions which materially contributed to Pat Gibson's resignation, and that this breach excused their failure to meet the condition of employment on sale. The court awarded the Gibsons the bonus. Because we hold that Beaux did not breach the duty of good faith and fair dealing, we reverse.

## I. FACTS AND PROCEEDINGS

In November 1975, Wiley Beaux, a developer, entered a contract preliminary to the purchase of the Klondike Inn, a resort complex at Big Lake, Alaska. Beaux used the name Klondike Industries Corporation, which he actually incorporated (as sole shareholder) some weeks later. Although corporate records indicated that three directors met for its organization, there was no such meeting.

In May 1976, KIC purchased the Klondike, which included a restaurant, bar and hotel housed in "Unit 100," plus residential condominium units, parking lots and undeveloped lots. At first, Beaux sought to convert hotel units into condominiums for individual sale. This did not succeed.

Beaux determined to operate the Klondike so he could afford to hold on to it until a profitable sale could be arranged. Beaux hired his cousin, Pat Gibson, an Idaho resident, who had no prior restaurant or bar experience, to manage the place. Pat took the job in order to help his cousin Beaux save the property and avoid bankruptcy. Beaux and Gibson worked together on remodeling necessary to open the facility during May. In early June, Pat's wife Bernice joined them.

The Gibsons agreed with Beaux that they would manage the Klondike until its sale for a salary of $1,500 per month (jointly), their room and board, a 37½% share of profits from the operation, and a bonus when the Klondike sold based on a percentage of the sale price of the property in

---

1. For simplicity we will generally refer to both appellants as "Beaux."

excess of $200,000. The bonus percentage was to increase based on the length of time necessary to sell the property up to a maximum of 45% in the third year. The parties intended that the property would be sold within three years.

The Gibsons then signed two employment agreements prepared by Beaux to memorialize the oral agreement. The written agreements provided, in part:

3. As additional consideration to GIBSON, KLONDIKE agrees that *if Unit 100 of the Klondike Condominiums is sold by KLONDIKE during the term of GIBSON's employment as manager* of the business operating in said unit, GIBSON shall receive the following as an additional bonus:

(a) If Unit 100 is conveyed and sold to a third party within one (1) year from the date of this Agreement, GIBSON will receive (1) ten percent (10%) of the net sales proceeds, or EIGHT THOUSAND DOLLARS ($8,000.00), whichever is less, or (2) twenty percent (20%) of the sales price above TWO HUNDRED THOUSAND DOLLARS ($200,000.00), whichever of these two alternatives is greater.

(b) If Unit 100 is sold and conveyed to a third party during the second year of this Agreement, GIBSON will receive five percent (5%) of the gross sale price or twenty-five percent (25%) of the sale price above TWO HUNDRED THOUSAND DOLLARS ($200,-000.00), whichever is greater.

(c) If Unit 100 is sold and conveyed to a third party after the second full year of this Agreement, GIBSON will receive ten percent (10%) of the sales price or forty-five percent (45%) of the sales price above TWO HUNDRED THOUSAND DOLLARS ($200,000.00), whichever is greater.

4. This Agreement shall run concurrent with an Employment Agreement entered into between the parties on this date. The termination provisions of the Employment Agreement are incorporated herein by reference, *it being understood that to receive the benefits of this Agreement, GIBSON must remain as an employee of KLONDIKE under the terms of the Employment Agreement of even date,* as such Agreement may be modified or amended by the parties.

(Emphasis added.)

The "Employment Agreement" referred to in paragraph 4 included the following provision:

5. This Agreement may be terminated by either party at will, or by mutual agreement, and ten (10) days' written notice shall be required to be given in the event of a unilateral termination.

The Gibsons worked long, hard hours at the Klondike. They attempted to keep the facilities open 21 hours a day at Beaux's request. They tended bar, cooked, cleaned, and performed other menial tasks; they also handled bookkeeping and management.

The business was never a booming success. No profit shares were ever distributed to the Gibsons, apparently because the Klondike never turned a profit. Indeed, the Klondike's operating revenues were apparently insufficient to pay the mortgage payments due on the property. In May 1980, Beaux gave the Gibsons a list of mortgages (totalling over $4,500 per month) to be paid from the revenues. The Gibsons made some of these mortgage payments from the operating account.

Beaux tried unsuccessfully to sell the Klondike between 1977 and 1982. He entered into formal listing agreements in 1978, 1981 and 1982, but received only one offer prior to May 4, 1982.

In March 1978, Beaux asked the Gibsons to "purchase" from KIC the condominium unit they were then living in, Unit 102. The Gibsons obtained a bank loan to make the purchase; Beaux provided the down payment. Monthly payments on the Gibsons' mortgage were taken from Klondike revenues. This "sale" freed up some of the capital Beaux had invested in the complex. Beaux had previously "sold" units through similar transactions to his girlfriend ·and to the Gibsons' daughter, who had deeded the units back to KIC. No such "deed back" was recorded in this case.

The Gibsons did not make mortgage payments on Unit 102 after they left the Klondike.

Bernice Gibson left the Klondike in June 1981 for health reasons, although she continued to help with management from Anchorage. Beaux was aware of this move and said nothing about it at the time.

Sometime prior to April 1982, the Gibsons requested an ownership interest in the Klondike. Beaux offered a proposal that would have immediately given the Gibsons 16.43% of the stock of KIC, and maintained the contingent bonus on sale. However, Beaux's proposal increased by $83,750 the base below which no bonus was payable, reflecting Beaux's increased investment in the property. Pat Gibson rejected this proposal; Beaux threatened to fire him and close down the Klondike. The Gibsons asserted that Beaux then undertook the following acts to force Pat to resign.

First, at a meeting in spring 1982, Beaux told Gibson that he should return $7 in revenue for every $1 of liquor purchased. Beaux said that Gibson had been returning only $2.80, and Beaux demanded to know where the rest of the money was going. Pat believed that Beaux was insinuating that Pat embezzled the difference.

Next, Beaux chose to change the atmosphere of the Klondike by bringing in live country-western or rock music. Pat had fostered a very different atmosphere (featuring a pianist) and was uncomfortable with the new atmosphere. Beaux also gave Pat Gibson specific days off and required that Pat be a "24–hours employee" other days. Finally, Beaux made another proposal for a change in the bonus agreement, offering to guarantee the Gibsons $50,000 upon sale of the Klondike (regardless of when it sold) if Pat continued to work through September 15, 1982. Pat declined this proposal too.

Pat resigned voluntarily on May 21, 1982. He worked an additional month under a separate agreement.

The Gibsons claimed that they were owed salary payments; Beaux disputed this because he believed certain checks the Gibsons had written on the KIC account were properly chargeable to the Gibsons' salary. The Gibsons recorded a lien for wages against the Klondike.

Beaux sold the Klondike Inn for $735,000 as a stock sale of KIC (to avoid the Gibsons' *lis pendens*) on February 1, 1983. The sale included the hotel complex, parking lots, hillside lots, liquor license and receivables, and five residential condominium units. Under the terms of the sale agreement, Beaux retained a security interest in the Klondike. As a result of the buyers' subsequent default, Beaux foreclosed his security interest. He now holds the Klondike personally.

The Gibsons sued Beaux to foreclose their wage lien and recover damages for his alleged breach of the bonus agreement. Following a bench trial, the court determined that the value of the Klondike for the purpose of the bonus calculation was $465,000. The court found that the Gibsons had performed their duties fully. The court reduced this sum by 7/68 (to $106,967.25) to reflect that the Gibsons were not employed at the Klondike for seven of the 68 months between the agreement's execution and the sale.[2]

The trial court held that the Gibsons had no enforceable rights pursuant to their oral agreement with Beaux because it had been integrated into the written contract. In enforcing the written contract, the court excused the condition that required the Gibsons to be employed at the time of the sale in order to receive the bonus. The court reasoned that Beaux had breached the implied duty of good faith and fair dealing and thereby contributed to the Gibsons' departure. The court observed that "[t]his conclusion derives some support from the doc-

---

**2.** Apparently the trial court gave the Gibsons "credit" for Pat's employment during June 1982 under a separate agreement, so that only seven months, not eight, separated Pat's termination from the sale date.

trines of mistake ... excuse of conditions on grounds of public policy ... excuse of condition to avoid forfeiture ... [and] Event that Terminates a Duty." Accordingly, the court awarded the Gibsons the bonus.

The court also found that KIC owed the Gibsons $20,664.93 in back wages. It reduced the Gibsons' wage claims slightly to reflect that KIC paid taxes owed by the Gibsons, but did not reduce their wages due to Bernice Gibson's absence in spring 1982. The court denied the Gibsons a penalty award under AS 23.05.140(d) for delinquent payment of wages.

The court held that Beaux, not the Gibsons, owned Unit 102 and was entitled to the proceeds of its sale, because the Gibsons did not make any payment on the unit, and Beaux did not intend it to be a gift to them.

The court held Beaux personally liable for the bonus and wages due to the Gibsons because Beaux controlled KIC and had abused the corporate structure to the Gibsons' prejudice. Finally, the court held that the Gibsons had substantially complied with the accounting requirement for foreclosure of their wage lien against the Klondike under AS 34.35.440, and foreclosed the lien. The court awarded the Gibsons attorney's fees of $40,000.

Beaux appeals. He contends that he did not breach the duty of good faith and fair dealing, and that the trial court could not excuse the condition for any other reason. He also appeals the amount of wages awarded, the determination of personal liability, and the attorney's fees award. The Gibsons cross appeal the award of Unit 102 to Beaux and the denial of their claim for the statutory wage penalty.

**3.** The trial court held that any previous oral agreement between the parties was integrated into the written agreement so that no different term in the oral agreement could provide relief to the Gibsons. The Gibsons' quarrel with this holding, expressed cursorily in their brief and at oral argument, is without merit.

## II. BONUS AGREEMENT

The written employement agreement[3] between Beaux and the Gibsons provided that "if Unit 100 ... is sold by KLONDIKE during the term of GIBSON's employment as manager of the business operating in said unit, GIBSON shall receive the following as an additional bonus ...," and that "it [is] understood that to receive the benefits of this Agreement [the bonus on sale], GIBSON must remain as an employee of KLONDIKE...." The trial court held that these provisions made Pat Gibson's employment at the time of the sale of the Klondike a condition precedent to Beaux's duty to pay the bonus.[4] This holding is not disputed.

As a general rule, when a party's performance is subject to a condition precedent, that party's duty to perform arises only if the condition is met or is excused. Restatement (Second) of Contracts § 224 (1981); *see Norton v. Herron,* 677 P.2d 877, 882 (Alaska 1984) (quoting *Peterson v. Wirum,* 625 P.2d 866, 873 n. 14 (Alaska 1981)) (a conditional contract "involve[s] the consequences that a slight failure to perform wholly destroys all rights under the contract ...")

The court found that the condition precedent to Beaux's duty to pay the bonus was not met. Pat Gibson terminated his employment under the agreement on May 21, 1982 and the Klondike was sold on February 1, 1983, following initial negotiations beginning in late August or early September 1982. Although Pat Gibson had worked for five years at the Klondike, and it sold only seven or eight months after he left, he did not meet the condition that he be employed at the time it sold. His partial performance entitles him to no part of the bonus. *See, e.g., Walker v. American Optical Corp.,* 509 P.2d 439, 441 (Or.1973) (bonus plan once begun, cannot be revoked

**4.** Although Bernice Gibson was also employed pursuant to the agreement and worked as co-manager alongside Pat, the court apparently found, and Beaux does not dispute, that her resignation in June 1981 does not affect the Gibsons' claim for the bonus.

by employer, but employer has no duty to pay bonus to employee who quit before bonus became payable); *Schotter v. Carnegie Steel Corp.*, 116 A. 358, 359 (Pa.1922), and *Roberts v. Mays Mills, Inc.*, 114 S.E. 530, 531 (N.C.1922) (bonus forfeit where employee quits voluntarily before it becomes payable). The trial court found that Pat Gibson quit voluntarily in part in order to return to teaching.[5] The rule requiring full performance of conditions leads to the conclusion that the Gibsons did not earn the bonus.

However, the trial court held that the bonus was payable because the condition was excused. The court identified five reasons to excuse the Gibsons' performance of the condition: (1) Beaux breached the duty of good faith and fair dealing in his dealings with the Gibsons, thereby "materially contributing" to their non-performance (citing Restatement (Second) of Contracts (hereinafter Restatement) § 245); (2) the parties' mutual mistake as to the time needed to sell the Klondike voided the condition (citing Restatement §§ 153, 164); (3) the condition violated public policy (citing Restatement § 185); (4) the condition imposed a disproportionate forfeiture (citing Restatement, § 229); and (5) Beaux's duty to pay the bonus was not terminated by Pat's resignation, because Pat resigned as a result of Beaux's wrongful acts (citing Restatement § 230). Beaux disputes each of these rationales.

A. Mistake, Public Policy, Disproportionate Forfeiture and Event that Terminates a Duty.

■ We may dismiss four of the lower court's rationales at the outset. A representation as to a future course of conduct cannot be a mistake. Restatement § 293 comment a; *see Shear v. Nat'l. Rifle Assoc.*, 606 F.2d 1251, 1260 (D.C.Cir.1979).

Even if Beaux did "guarantee" that the Klondike would sell within three years,[6] the Gibsons could not reasonably rely on an assertion that a property would sell at a profit within a given amount of time. In *Shear*, the court denied that a plaintiff could rescind a sales commission agreement due to the "mutual mistake" of the parties that the defendant's management committee would recommend approval of the contract procured by plaintiff. "The mistake doctrine does not apply to predictions or promises of future conduct." *Id.* at 1260. We agree. The fact that the parties here anticipated the sale of the Klondike within three years instead of the five years and eight months that it actually took cannot, without more, justify excusing the employment at sale requirement.

The Gibsons argue that the condition was not an essential part of the employment agreement; therefore, the trial court could properly excuse the agreement pursuant to Restatement § 185 (excuse of condition on grounds of public policy "unless its occurrence was an essential part of the agreed exchange.")

■ The trial court apparently held that the employment on sale condition violated public policy because it required Pat Gibson to continue to work for Beaux for an indefinite period despite personal friction between the two. The court observed that a court may refuse to specifically enforce a personal services contract where one party objects to the other. *See Zannis v. Lake Shore Radiologists, Ltd.*, 73 Ill.App.3d 901, 29 Ill.Dec. 569, 572, 392 N.E.2d 126, 129 (Ill.App.1979) ("as a matter of public policy courts will avoid the friction that would be caused by compelling an employee to work, or an employer to hire or retain someone against their wishes.") The trial court concluded, "it would similarly be contrary to

---

5. The court's holding that a constructive discharge occurred is inconsistent with the finding that Pat quit voluntarily and is without merit. *Cf. Knee v. School District No. 139*, 106 Idaho 152, 155, 676 P.2d 727, 730 (App.1984) (constructive discharge requires a showing of "harassment, intimidation, coercion or other aggravating conduct on the part of the employer which renders working conditions intolerable.")

6. The trial court found that he did, apparently based on his deposition testimony. At trial, Beaux denied making such a guarantee. We will not disturb the trial court's finding of fact on this matter.

public policy to have compelled, in retrospect, Pat Gibson to have continued in the employ of Wiley Beaux." As we noted earlier, bonus agreements conditioned on continued employment have been widely upheld. *E.g., Walker,* 509 P.2d at 441. We conclude that the condition cannot be excused on grounds of public policy.[7]

The Gibsons concede that the condition of employment on sale is material to the bonus agreement, thereby precluding excuse of the condition pursuant to Restatement § 229 (a condition which will result in disproportionate forfeiture may be excused "unless its occurrence was a material part of the agreed exchange.")

The trial court's reliance upon Restatement § 230 to excuse the employment on sale condition also is misplaced. This section excuses conditions subsequent; that is, those events which, if they occur, terminate an otherwise existing duty. *Id.,* comment a; J. Calamari & J. Perillo, *The Law of Contracts,* §§ 11–3, 11–5 at 384–86 (2d ed. 1977). The employment on sale condition at issue here was clearly a condition precedent; that is, Beaux's duty to pay the bonus did not arise at all until the employment on sale condition was met. The trial court expressly so held. Restatement § 230 cannot provide a ground for excuse of the condition at issue.[8]

### B. Duty of Good Faith and Fair Dealing.

The trial court found that Beaux breached his duty of good faith and fair dealing and that this breach contributed materially to Pat Gibson's failure to remain employed until the Klondike's sale. The court held that under Restatement § 245, the condition was excused, giving rise to Beaux's duty to pay the bonus.

Beaux argues first that this court should not adopt § 245 in employment contract cases, and second, that the trial court's conclusion that Beaux breached the duty of good faith and fair dealing was clearly erroneous.

■ Beaux argues that Restatement § 245 should not be applied in employment cases because its use would inhibit employers from making legitimate business decisions. We disagree, and adopt § 245. In *Mitford v. de Lasala,* 666 P.2d 1000, 1006–07 (Alaska 1983), we held that a condition requiring continued employment was excused when the employer fired the employee in bad faith thus *preventing* the employee's continued employment. *See also* Restatement of Contracts § 295 (1932); 3A Corbin on Contracts § 767 (1961); 5 Williston on Contracts § 677 (3d ed. 1961). Unlike the First Restatement and our *Mitford* rule, Restatement (Second) § 245 does not contain a "prevention" requirement; instead, it provides that a condition is excused if one party's breach "contributes materially" to the nonoccurrence of the condition. The trial court did not find that Beaux's actions prevented Pat Gibson from remaining employed; it stated that Pat quit voluntarily, after carefully considering his position. Instead, it found that Beaux's acts contributed materially to Pat's decision to resign.

Proof of "prevention" involves "speculation as to what would have happened had the defendant's conduct not taken place." *Shear,* 606 F.2d at 1257. Such speculation is bound to be uncertain; the less stringent standard of § 245 is simply more realistic. Moreover, the defendant whose acts constitute a significant reason for the other party's inability to perform should not be able to avoid an agreed duty merely because he can point to some other causative factor.

■ In this case, however, we find that the trial court erred in its determination

7. Comment b to Restatement § 185 explains that the section applies to excuse a non-essential condition that violates public policy, but if such a condition *is* essential, under § 178 the entire contract may be unenforceable. This result would release Beaux from his duty to pay the bonus, a result the Gibsons would clearly prefer to avoid.

8. In any event, the substantive question raised by Restatement § 230, whether Beaux breached a duty of good faith and fair dealing to the Gibsons, is raised separately and is analyzed *infra.*

that Beaux breached his duty of good faith and fair dealing. Therefore, we must reverse the excuse of the condition under Restatement § 245. Because we have found no other reason to support excuse of the condition, we must reverse the award of the bonus.

We have previously held that the duty of good faith and fair dealing implied in all contracts requires "that neither party ... do anything which will injure the right of the other to receive the benefits of the agreement." *Guin v. Ha,* 591 P.2d 1281, 1291 (Alaska 1979). Comment a to Restatement § 205 states:

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party....

Comment (d) of the same section notes that:

> [s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty....

In *Mitford,* the employer breached the duty of good faith and fair dealing because he fired the employee "for the purpose of preventing him from sharing in future profits...." 666 P.2d at 1007. Recently we suggested that evidence that an employer treated different employees differently in like circumstances would be relevant to showing a breach of the duty. *Rutledge v. Alyeska Pipeline Service Co.,* 727 P.2d 1050, 1056 (Alaska 1986).

In this case, the trial court found seven circumstances which established Beaux's breach of the duty. We will examine each of these in turn.

### (1) Sale Date Guarantee

The trial court found that Beaux guaranteed the sale of the Klondike within three years, and that this misrepresentation led the Gibsons to enter the contract. Although Beaux disputes this finding,[9] we do not believe that the trial court's finding was clearly erroneous. However, even if this statement were a misrepresentation,[10] the record discloses that Beaux made reasonable efforts to sell the Klondike throughout the Gibsons' tenure. He listed it with real estate agents, made cash investments to upgrade the property, and worked at the Klondike himself along with his wife and children, without wage. Despite these efforts, prior to Gibsons' termination in 1982, Beaux had received only one offer on the property. That offer was unacceptable because it involved an exchange of property. Therefore, Beaux's failure to consummate a sale within three years cannot be evidence of bad faith.

The trial court may have found bad faith in the fact that, after five years of allegedly trying to sell the Klondike, Beaux sold it seven months after the Gibsons left. While we agree that a deliberate manipulation of the listing price to avoid a sale until after the Gibsons were no longer employed would have constituted bad faith, the record is devoid of evidence of deliberate manipulation of the sale. Therefore, if that is the basis for the finding of bad faith, we deem it clearly erroneous.

### (2) Excessive Work Requirements

The court also held that the work the Gibsons were required to perform was "greatly in excess of anything told them in advance." The court acknowledged that they had ample opportunity before signing the agreement to become aware "that much work would be required of them." However, it found that "it was not until they ... had taken up residence at the Inn that the nature and extent of their 'management' duties became clear."

The Gibsons moved into the Klondike in June, 1977 and did not sign the written employment agreement until July 28, 1977. During one month, they had ample oppor-

---

**9.** *See supra* n. 7.

**10.** Restatement § 159, comment (c), asserts that a statement of a future event cannot be the basis of a misrepresentation.

tunity to become aware of the hours necessary. Pat Gibson noted that in June, they each put in no less than 12 to 14 hours per day. By then, the operation was open 23 hours a day, the legal maximum. During those first few months, Pat Gibson testified, they "stocked beer, cleaned the kitchen, cleaned the bar, ... rented rooms, did laundry, pulled shift[s]."

However, the Gibsons were managers with substantial autonomy. They hired cooks, bartenders and waitresses. They could largely set their own hours. They took vacations to Fairbanks, Hawaii and Idaho; Pat took fishing trips and taught as a substitute at a local school. Nothing in the record indicates Beaux demanded ever-increasing work from the Gibsons. There is no allegation of a threat to fire them if they didn't work harder.

In short, the record is devoid of any indication that Beaux's purpose in expecting that the Gibsons put in long hours and hard work was anything but the reasonable business purpose, evident from the beginning of their relationship, that the Gibsons put forth the necessary effort to make the Klondike succeed. We conclude that the long hours and hard work required did not breach the duty of good faith and fair dealing.

### (3) Bonus Agreement Modification

The court also found that Beaux's proposal for changes in the bonus agreement were presented on a "take it or leave it" basis and constituted evidence of bad faith. The record does support the finding that Beaux threatened to fire Pat Gibson, or to shut the Klondike down, if Pat refused to sign the second agreement modification. However, we find that the proposal, even if accompanied by a threat of termination, was not made in bad faith. Beaux had every right to fire Gibson, thus terminating the bonus agreement, so long as he did so for a legitimate business reason. Moreover, the proposed modification provided advantages to both parties. Under the proposal, Gibson would have received a bonus (of $50,000), even if he was not working at the time the Klondike was sold, if he worked through September 15, 1982; Beaux's advantage was that the bonus calculation would reflect an additional $83,750 in increased capital Beaux claimed he invested.[11] In addition, Beaux testified that Gibson could continue to work under the existing agreement. Finally, regardless of the nature and gravity of Beaux's "threats,"[12] he took no action on them. Instead, Pat Gibson quit voluntarily. He conceded that his desire to return to teaching was at least a significant reason for his quitting. Beaux's threat to fire Gibson appears to have been aggressive posturing for negotiation; when Gibson refused to knuckle under, Beaux did not carry out his threat. This threat did not rise to the level of a breach of good faith and fair dealing.

### (4) Insinuation of Embezzlement

The trial court found that Beaux's questions to Pat Gibson concerning the rate of return on liquor sales were evidence of bad faith. However, the Gibsons' own expert testified that the financial records kept by the Gibsons were not entirely adequate.

11. The proposal stated, in pertinent part:
(a) If the sale of Unit 100 closes before September 15, 1982, and provided that Myles Gibson's employment has not been terminated by the date of closing, then Gibsons shall receive the greater of
(i) $50,000; or
(ii) .45 x (sales price after closing costs, [less $283,750] *less* operating costs paid from the capital account between April 1, 1982 and the date of closing)
(b) If the sale of Unit 100 closes after September 15, 1982, and provided that Myles Gibson's employment does not terminate prior to September 15, 1982, then Gibsons shall receive the sum of $50,000 payable out of the sale proceeds at the time of closing.
Clearly the parties agreed that Bernice Gibson's prior termination did not affect the bonus agreement. Material in brackets was apparently erroneously omitted from the trial court's quotation of the modification; no original is in the record but the court's statements and Appellant's quotations affirm the inclusion of this phrase.

12. Beaux explained that "we were both upset" and that, when angry, "I usually flare up real fast and—very irrational for a short period of time and then come back to fairly level fairly rapidly."

Beaux, as owner, had every right to question his manager concerning return on investment. The trial court did not find that Beaux's "accusations" were made without a business reason and nothing in the record suggests that to be the case. This finding of bad faith is clearly erroneous.

### (5) Pressure to Sell

The trial court also found bad faith in Beaux's failure to advise Pat Gibson that a large balloon payment came due on the Klondike in September 1982, making sale of the property imperative, and that he intended to re-list the property. This failure, however, is not bad faith. First, Gibson knew or should have known of the terms of the note. Beaux testified without contradiction that he told Gibson of it; furthermore, Gibson was responsible for making the payments on the note, and he had contact with the holder of the note. Finally, the note was ultimately renegotiated anyway; thus, its significance to the sale is speculative. In any event, Beaux's acts regarding the loan cannot be considered inherently unfair to the Gibsons. The property was essentially always for sale; it had been listed frequently. Further, the record does not support the view that Beaux had a buyer already lined up before Gibson quit. Therefore, Beaux's failure specifically to mention the balloon payment is not evidence of bad faith.

### (6) Image Change

The trial court held that Beaux's "drastic change of image for the Klondike, from 'family' style to rock, or country rock" was additional evidence of his bad faith dealings with Pat. We disagree. Beaux, as owner, had every right to order changes in the Klondike's music to attract a larger clientele. *See Kirchof v. Friedman,* 10 Ariz. App. 220, 457 P.2d 760 (1969) (restaurant owner's decision to change the menu, advertising and entertainment was held to be a matter of policy making properly subject to the owner's control, not day-to-day management which was the domain of the manager. Therefore, the court denied the manager the right to recover for breach of two-year employment contract.) *See also* Annotation, *Reduction in Rank or Authority or Change of Duties as Breach of Employment Contract,* 63 A.L.R.3d 539 (1975). Therefore, Pat's "discomfort" with the new format, even if Beaux was aware of his reaction, is not legally sufficient to constitute evidence that Beaux acted in bad faith.

### (7) Inequality of Bargaining Position

The trial court found that Pat had a close family relationship with his cousin Beaux and that Pat, educated as a teacher and lacking business acumen, "put his faith" in Beaux, a wily real estate developer. The court concluded that the employment agreements were not "arms length business transactions." We agree that these factors could play a part in a bad faith determination. However, we note that the trial court also found that the Gibsons reviewed the agreements overnight, that both Pat and Bernice had been involved in sales and that Pat was ten years older than Beaux. We hold that the personal relationship between the parties does not mandate a higher standard of good faith than that mandated by the employer-employee relationship.

We conclude that none of Beaux's acts injured the right of the Gibsons to receive the bonus; rather, his conduct was either relatively neutral or was designed to produce a profitable sale of the Klondike. Here, the totality of the circumstances did not evidence bad faith. We therefore hold that Beaux's dealings with the Gibsons did not constitute a breach of his duty of good faith and fair dealing. We conclude that the trial court erred in excusing the "employment-on-sale" condition, and accordingly reverse the bonus award.

### III. PROCEEDS FROM THE SALE OF UNIT 102

After the Gibsons left the Klondike, condominium unit 102 was sold to a third party. Although the Gibsons had held legal title to unit 102, the trial court awarded the proceeds from this sale to Beaux. The court found that the Gibsons' purchase of Unit 102 was not "real" and held, "[t]here is no equitable reason for awarding the

sale proceeds to the Gibsons, since they made no payments on the unit." This decision misallocated the burden of proving the equitable remedy.

■ It is axiomatic that the holders of legal title to a property are entitled to the proceeds of its sale unless a court imposes on the property an equitable remedy, such as a constructive trust, in favor of another. The burden of proof must fall on the party seeking to impose the equitable remedy, in this case, Beaux.

The trial court, however, did not find that Beaux had an equitable right to Unit 102. Instead, it stated that the Gibsons lacked an equitable interest in the property. We believe that this language indicates that the trial court erroneously imposed the burden of establishing the equitable remedy on the Gibsons rather than on Beaux.

Because the trial court incorrectly imposed the burden of proving equitable relief on the Gibsons, we reverse its award of the proceeds of Unit 102 to Beaux and remand for a determination whether Beaux is entitled to the equitable relief he seeks. If the trial court finds, on remand, that Beaux has not proved his equitable right to the proceeds, then it must award the proceeds to the Gibsons.

### IV. UNPAID WAGES

The trial court found that the Gibsons were owed $20,664.93 in unpaid wages, after appropriate deductions. Beaux contends that he paid the Gibsons' income taxes and other "labor burden" totalling $6,000, and that this sum should be deducted from their wage award. Testimony concerning these deductions was provided both by Beaux and by Bernice Gibson. The trial court held that Beaux had failed to prove that the Gibsons' wages should be reduced due to tax withholding. We are not firmly convinced that this finding is erroneous.

■ The trial court denied the Gibsons' claim that Beaux should pay a penalty as authorized by AS 23.05.140(d) because he failed to pay their wages. Alaska Statute 23.05.140(d) provides:

If an employer violates (b) of this section by failing to pay within three working days of termination, the employer *may* be required to pay the employee a penalty in the amount of the employee's regular wage, salary or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount.

(Emphasis added.) The award of a penalty under this section is within the sound discretion of the trial court. The court found no evidence that Beaux intentionally withheld wages due. Therefore, the court denied the penalty claim. We see no abuse of discretion here.

### V. BEAUX'S PERSONAL LIABILITY FOR THE WAGE JUDGMENT AGAINST KIC

■ The trial court held that Beaux was personally liable for the judgment against KIC because Beaux controlled the corporation and abused the corporate structure to the Gibsons' prejudice. Beaux concedes that he controlled the corporation, but asserts that the court erred in finding that his acts prejudiced the Gibsons.

In *Eagle Air, Inc. v. Corroon & Black/Dawson & Co.*, 648 P.2d 1000, 1004–05 (Alaska 1982), we held that a shareholder could be held personally liable for a corporate obligation if he controlled the corporation (as determined by six control factors) and used the corporate form "to defeat public convenience, justify wrong, commit fraud or defend crime."

The trial court found that Beaux had used KIC funds to pay personal obligations, and that he repaid his own loans to KIC although secured creditors (mortgagees) were left unpaid. The Gibsons at least occasionally had transferred operating funds into the KIC capital account which Beaux used to repay his own loans. As a result, KIC's operating account occasionally lacked funds to pay the Gibsons' salary. Beaux points out that he ultimately injected more money into KIC than he took out and that the Gibsons were not prejudiced by any arrearages on the Klondike's mortgages. We agree. However, the Gibsons

were prejudiced by Beaux's withdrawals from the operating account that made their monthly salary occasionally unavailable. We hold that this prejudice alone is sufficient to uphold the trial court's decision to pierce the corporate veil.

## VI. CONCLUSION

The award of the bonus to the Gibsons is reversed. The award of the sales proceeds from Unit 102 to Beaux is reversed and remanded for redetermination in accordance with our discussion. The award of attorney's fees is reversed and remanded for redetermination. All other holdings are affirmed.

REVERSED in part, REMANDED in part, AFFIRMED in part.