METCALFE INVESTMENTS,
INC., Appellant,

v.

Linda S. GARRISON, David A. Garrison
and All Alaska Realestate Investments,
Inc., Appellees.

No. S–6772.

Supreme Court of Alaska.

June 28, 1996.

---

Milford H. Knutson, Bledsoe & Knutson, Anchorage, for Appellant.

H. Frank Cahill, McNall & Associates, P.C., Anchorage, for Appellee Linda S. Garrison.

Clifford J. Groh, Sr. and Todd J. Timmermans, Groh, Eggers & Price, Anchorage, for Appellees David A. Garrison and All Alaska Realestate Investments, Inc.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Metcalfe Investments appeals from the trial court's grant of summary judgment in favor of Linda Garrison, David Garrison, and All Alaska Realestate. We conclude that there are genuine issues of material fact that require us to reverse the grant of summary judgment.

### II. FACTS AND PROCEEDINGS

■ The parties presented contradictory versions of the events that culminated in this lawsuit. Because Metcalfe Investments opposed summary judgment below, we must review the record in the light most favorable to Metcalfe Investments and draw all reasonable inferences in its favor. *Wilson v. Pollet,* 416 P.2d 381, 383–84 (Alaska 1966); Charles A. Wright et al., *Federal Practice and Procedure* § 2716, at 643 (1983). For purposes of reviewing the trial court's grant of summary

judgment, we examine Metcalfe Investments' proffered evidence to determine whether it raises genuine issues of material fact.

Ray Metcalfe is the president and sole shareholder of Metcalfe Investments, Inc., a real estate brokerage firm. Metcalfe Investments specializes in the sale of homes acquired by the U.S. Department of Housing and Urban Development. The company attracts potential buyers with extensive advertising. People who call in response to the ads have their names placed on a list of people in the Anchorage area who are interested in purchasing residential property.

Toward the end of December 1990, Ray Metcalfe hired Linda Garrison (Garrison) to work for Metcalfe Investments as an independent contractor. Metcalfe told her that she would be responsible for paying her own federal income taxes, social security, workers' compensation, and unemployment insurance.

Garrison's job was primarily to sell real estate for the company. She was to do so from the list of names generated by company advertising and to add to the list as new contacts came into the office. Metcalfe told her how the list had been developed and how to maintain it. He also asserts that he told her that the list was company property and that she could not use it or take it with her in the event of her departure.

Metcalfe claims that he instructed Garrison that if she left Metcalfe Investments, she would receive no commissions on sales made to customers she had worked with if those sales were completed after her termination. Further, she would have to "refrain from participating in sales to any potential buyers who had made first contact with Metcalfe Investments, Inc. during the term of her employment" unless Metcalfe granted permission to do so. The division of any commissions from transactions in closing at the time of her departure would be negotiated and subject to agreement between the two of them.

According to Metcalfe, Garrison acknowledged that she fully understood the requirement that she refrain from contacting Metcalfe Investments' customers after her departure, and she accepted it as a condition of her employment. While Metcalfe admits that there was no discussion as to how long this agreement would remain in effect, he assumed that it would last for one year after Garrison left Metcalfe Investments. He believed that Garrison had a similar understanding because of the nature of the Anchorage real estate market and Metcalfe Investments' manner of doing business. Garrison denies the existence of any such agreement.

While working as an independent contractor, Garrison initially was paid solely on a commission basis (fifty percent of all commissions). Shortly thereafter, Garrison asked Metcalfe to make her a salaried employee so that she could have a reliable source of income every month. Metcalfe agreed to pay Garrison a salary of $4,800 per month in addition to a productivity bonus to be determined in Metcalfe's discretion. Metcalfe recounts that after numerous discussions between himself, Garrison, and the company bookkeeper, it was agreed that Garrison would receive as a bonus whatever was left over after Metcalfe Investments took its fifty percent share of all sales commissions earned on property sold as a result of Garrison's efforts and covered Garrison's salary of $4,800 per month and the costs of having made her an employee. These costs included workers' compensation, unemployment insurance, all employer's matching funds for social security, Medicare and other incidental items.

During the period of negotiations Garrison had been receiving her salary of $4,800 plus a bonus of a full fifty percent of her sales commissions over $9,600. Metcalfe alleges that he realized that he had overpaid Garrison from February through September based on the bonus arrangement which was ultimately devised. Therefore, according to Metcalfe, Garrison's subsequent paychecks were held to the minimum $4,800 until Metcalfe Investments recouped the employer's share of the taxes and contributions and until a $4,800 reserve was created to pay her salary in a month when she might earn no commissions. Garrison denies that she ever

agreed to have her commissions reduced by the costs of making her an employee.

When Metcalfe later hired another employee to assist Garrison with her administrative duties, he reduced Garrison's share of her commissions from fifty percent to forty percent to pay the new employee's wages. Metcalfe also deducted certain legal fees from Garrison's commissions when a client sued Garrison and Metcalfe Investments.

Metcalfe maintains that Garrison was paid all of the salary and bonuses due to her on January 15, 1992. Garrison resigned that same day. The next day, Garrison opened All Alaska Realestate Investments (AAR). She placed an ad in the *Anchorage Daily News* classified section announcing the opening of her new office and informing the public that she was now with AAR. Garrison admits to having notified a few potential customers with whom she had been working of her new affiliation so that they would have a choice of continuing to work with her or with another broker at Metcalfe Investments. Garrison also claims that when her clients called Metcalfe Investments, Metcalfe refused to advise the callers of her new business and telephone number.

Metcalfe alleges that at least five people on Metcalfe's list subsequently made purchases through AAR in violation of the noncompetition agreement. Metcalfe also asserts that some of these people originally had the properties shown to them by Metcalfe Investments employees other than Garrison.

When Garrison resigned, the reserve account created in August 1991 held $3,343.10. Metcalfe instructed the bookkeeper not to pay this amount to Garrison because she had taken Metcalfe Investments' customers. Garrison claims that she only contacted Metcalfe Investments' customers with whom she had worked personally.

Garrison filed suit in district court against Metcalfe Investments to recover the balance of her reserve account and other monies she claimed Metcalfe Investments owed to her. Metcalfe Investments denied the claim and filed a counterclaim for commissions collected by Garrison after starting AAR. Approximately eighteen months later, Metcalfe Investments filed a new action in the superior court against Garrison, her husband, and AAR. This complaint alleged that Garrison had breached her employment contract by contacting potential buyers from Metcalfe Investments' list, that AAR was unjustly enriched when it received commissions that should have gone to Metcalfe Investments, and that all three defendants intentionally interfered with Metcalfe Investments' prospective economic advantage or contractual relations. The defendants answered, Garrison filed a counterclaim re-asserting the claims for unpaid wages, and the cases were consolidated in the superior court.

Following preliminary discovery, Garrison moved for summary judgment on all issues. Garrison's husband, David, and AAR joined the motion through their separate counsel. Metcalfe Investments opposed summary judgment and submitted a number of supporting affidavits, as well as a list of six genuine issues of fact which it argued should preclude the entry of summary judgment.

The court found that Garrison was entitled to summary judgment on her wage claim and awarded her the employer's contribution to unemployment insurance ($814.20), social security and Medicare ($4,920.76), and workers' compensation premiums ($1,011.62). The court also awarded Garrison $881.22 as the undisputed balance of the reserve account. It awarded Garrison an additional penalty of $14,400 for improper withholding of her pay under AS 23.05.140(d). The court reserved for trial Garrison's claims for reimbursement of the deduction for attorney's fees and for an unpaid commission on a sale. The court denied Metcalfe Investments' contract claim on the ground that the noncompetition agreement was too vague to be enforced. Finally, the court granted summary judgment to Garrison's husband and AAR on all claims against them.

Final judgment was entered on all issues in favor of Garrison, her husband, and AAR.[1] This appeal followed.

---

1. Garrison provisionally waived her claim for the commission and legal expenses in order to obtain a final judgment.

## III. DISCUSSION

### A. Standard of Review

▮▮▮▮ We review the superior court's grant of summary judgment *de novo*. *Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995). The judgment will be affirmed only if no genuine issues of material fact exist and the moving parties are entitled to judgment as a matter of law. *Wright v. State,* 824 P.2d 718, 720 (Alaska 1992). We will consider any matter in the record that indicates the existence of a genuine issue of material fact. *American Restaurant Group v. Clark,* 889 P.2d 595, 597–98 (Alaska 1995). Finally, the non-moving party is entitled to have the record reviewed in the light most favorable to it and to have all reasonable inferences drawn in its favor. *Wilson v. Pollet,* 416 P.2d at 381–84.[2]

### B. Garrison Is Not Entitled to Summary Judgment on Her Claims for Back Wages and Penalties.

▮▮▮▮ The court granted Garrison summary judgment on her claim for back wages and awarded her treble damages under AS 23.05.140(d). While she may prevail on her wage claim at trial, she is not entitled to summary judgment. Furthermore, AS 23.05.140(d) does not support an award of treble damages.[3]

According to Metcalfe, after Garrison became a salaried employee, the amount of her bonus was to be determined solely in his discretion. Metcalfe recalls telling Garrison that he "promised to be fair" but that his decision would be based upon a number of factors, including "costs to the employer resulting from changing her status to one of employee." He alleges that some months later, he and Garrison agreed that her bonuses would be the net of one-half of commissions received as a result of her efforts, less all the costs of having her as an employee, including her base salary and "incidental costs which the employer was required to pay as a result of her status as an employee." Garrison disputes the nature of the agreement over commissions, claiming among other things that Metcalfe retroactively reduced her commissions.

Metcalfe does not dispute that the law prohibits an employer from deducting the employer's share of workers' compensation premiums and social security, Medicare, and unemployment taxes from an employee's wages.[4] Wages include commissions and bo-

---

**2.** In its argument before this court, Metcalfe Investments relies upon many facts that were not presented to the trial court until after its ruling granting summary judgment to Garrison and AAR. Garrison argues that this court should not consider the affidavits that Metcalfe Investments presented for the first time in support of its motion for reconsideration of the trial court's decision granting summary judgment. Garrison cites *State Dep't of Natural Resources v. Transamerica Premier Ins. Co.,* 856 P.2d 766, 776 (Alaska 1993) (post-trial affidavit could not be considered) and *Moffitt v. Moffitt,* 749 P.2d 343, 347 n. 4 (Alaska 1988) (appraisal appended to opposition to proposed findings and conclusions submitted before final decision made was properly part of record but could be given no evidentiary value). A number of courts in other jurisdictions have held that the trial court is not required to consider affidavits filed for the first time with a motion for reconsideration of a decision granting summary judgment. *See, e.g., Bukulmez v. Hertz Corp.,* 710 P.2d 1117, 1121 (Colo. App.1985) (Civil Rule 56 does not allow for affidavits to be filed after court has rendered judgment), *rev'd on other grounds, Blue Cross of Western New York v. Bukulmez,* 736 P.2d 834, 838–39 (Colo.1987); *Wells v. Great Atl. & Pac. Tea Co.,* 525 N.E.2d 1127, 1129–30 (Ill.App.1988) (court

properly rejected affidavit attached to motion for reconsideration).

We need not reach this issue because Metcalfe's initial opposition to the motion for summary judgment included an affidavit containing all of the critical allegations regarding the covenant not to compete and Garrison's bonus arrangement.

**3.** If Garrison prevails on her wage claim at trial, the trial court has the discretion to impose a statutory penalty pursuant to AS 23.05.140(d). *See Klondike Industries Corp. v. Gibson,* 741 P.2d 1161, 1171 (Alaska 1987). However, that penalty is not "automatic" as was erroneously argued to the trial court by Garrison's counsel. Nor is Garrison correct in her characterization of AS 23.05.140(d) as a "treble damages" provision. AS 23.05.140(d) provides that an "employer may be required to pay the employee a penalty in the amount of the employee's regular wage, salary, or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount."

**4.** For example, AS 23.20.165(a) prohibits an employer from deducting the employer's share of unemployment taxes from an employee's wages. .

nuses. *See, e.g.,* AS 23.20.530(a) (defining wages as "all remuneration for service from whatever source, including ... commissions [and] bonuses."). Garrison argues that Metcalfe deducted the employer's share of these taxes from her commissions, and is therefore liable to repay her those amounts.

According to Metcalfe, the parties agreed to a payment plan under which Garrison's bonus would be defined as fifty percent of her sales commissions less all expenses of her being an employee. We cannot say as a matter of law that an employer and employee may never agree to payment of a discretionary bonus on such a basis. The question of whether the parties agreed to payment of a discretionary bonus under the terms described by Metcalfe cannot be determined on summary judgment and will have to be answered at trial.

■ Metcalfe Investments has raised a genuine issue of material fact as to what the parties agreed Garrison's bonus would be. We must therefore reverse the trial court's grant of summary judgment and remand for trial so that the jury may determine what the salary agreement was and whether it violated state or federal law.

C. *Garrison Was Not Entitled to Summary Judgment on Metcalfe Investments' Claim that She Violated the Covenant Not to Compete.*

The trial court found that the noncompetition agreement described by Ray Metcalfe was too vague to be enforced.

1. *The noncompetition agreement was not impermissibly vague.*

■ The trial court had before it Metcalfe's version of the agreement, as well as supporting affidavits from other Metcalfe Investments employees. This evidence indicated that Garrison had agreed not to make use of Metcalfe Investments' client list after departing and not to participate in sales to potential buyers who had first made contact with Metcalfe Investments during her em-

ployment. The evidence, when viewed in the light most favorable to Metcalfe Investments, indicates that the agreement contained terms which were sufficiently well defined, and thus Garrison was not entitled to summary judgment on the ground that the agreement was too vague.

2. *The noncompetition agreement is not void for lack of a geographic or durational limitation.*

Garrison argues that the noncompetition agreement lacked any geographical or durational limitation. She further claims that there is no way for the court to determine such limitations, rendering the agreement unenforceable.

■ In *Data Management, Inc. v. Greene,* 757 P.2d 62 (Alaska 1988), we held that so long as an overly broad covenant not to compete was drafted in good faith, the court would make reasonable alterations to render it enforceable. *Id.* at 64–65. However, it is not necessary to turn to *Data Management* to imply a geographical or durational limitation to the agreement before us, because this agreement is enforceable even without such limits. This is not the type of noncompetition agreement that courts typically see, limiting a former employee's ability to engage in a trade or profession within a given area for some period of time. Instead, it is an agreement that left Garrison free to set up a carbon copy of Metcalfe Investments right down the street if she wished. The only thing she was prohibited from doing was expropriating information and customers that Metcalfe Investments had procured at its own expense. Thus the lack of a geographical limitation is irrelevant because the covenant was not a blanket prohibition on competition, but rather a selective restraint on doing business with people who were potential Metcalfe Investments customers at the time of her termination. Such restrictive covenants are subject to a less stringent test of reasonableness than blanket prohibitions of competition. *See Restatement (Second) of Contracts* § 188, cmt. g (1981) ("[A] restraint

Similarly, AS 23.30.245 makes an agreement by an employee to pay a portion of workers' compensation premiums invalid, and provides for the

imposition of criminal penalties on the employer for making such a deduction from the employee's pay.

is easier to justify ... if the restraint is limited to the taking of his former employer's customers as contrasted with competition in general."); *Corroon & Black of Ill., Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 671, 494 N.E.2d 785, 793 (1986) (activity restraints subject to less stringent test of reasonableness than geographic restraints). We conclude that the noncompetition agreement is not rendered unenforceable by the lack of a geographical or durational limitation. The limited scope of the activity restraint is narrowly drawn to protect Metcalfe Investments' interests in its customer lists.[5]

### 3. *The noncompetition agreement does not violate the statute of frauds.*

 The question of whether an oral noncompetition agreement of unlimited duration violates the statute of frauds is one of first impression in Alaska. In *Howarth v. First National Bank of Anchorage,* 540 P.2d 486, 491 (Alaska 1975), we held that a contract is not subject to the statute of frauds if it may be fully performed within one year from the time it is made. "In order for the statute of frauds to apply, it must appear that the parties intended, when they made the contract, that it should not be performed within the year." *Id.* (citations omitted); *see also* AS 09.25.010.

In his sworn affidavit, Metcalfe stated that there was no discussion of a time limitation on the noncompetition agreement; however, he assumed it would last for only a year. While it appears to be a question of first impression in Alaska, it is well-settled elsewhere that a promise to forebear or not to compete for an indefinite period of time is not within the statute of frauds. *See, e.g., Restatement (Second) of Contracts* § 130, cmt. b. and illus. 9 (1981) (taking position that even promise to forebear for specific number of years is not within statute of

frauds); Arthur L. Corbin, 2 *Corbin on Contracts* § 453, at 568 (1950); Walter H.E. Jaeger, 3 *Williston On Contracts* § 495, at 581 (3d ed. 1960); 72 Am.Jur.2d *Statute of Frauds* § 30 (1974); *Hall v. Solomon,* 23 A. 876, 878 (Conn.1892); *Frantz v. Parke,* 111 Idaho 1005, 1008, 729 P.2d 1068, 1071 (App. 1986); *Hampton v. Caldwell,* 95 Ark. 387, 129 S.W. 816, 816 (1910); *Barash v. Robinson,* 142 Wash. 118, 252 P. 680, 683 (1927). The rationale for this rule is that if the promisor were to die within a year, the promise not to compete would be fully performed. Corbin, *supra* at 569. A promise to forebear from competition is distinguished from an affirmative promise, where the contract might well be terminated by death, but the performance would still be incomplete. *Id.* at 569–70.

 We agree with the authorities cited above that a promise to refrain from an activity, such as using customer lists in a new business, for an unlimited period of time is not subject to the statute of frauds. The noncompetition agreement in this case is thus enforceable despite the fact that it was not in writing.

### 4. *The noncompetition agreement does not injure the public interest.*

Garrison argues that any agreement restricting the freedom of real estate purchasers to choose a broker injures the public interest. She also notes that because Alaska lawyers are prohibited from restraining the rights of other lawyers to take clients with them if they leave their firms, real estate brokers should operate under the same rules. *See* Alaska Rules of Professional Conduct, Rule 5.6(a). She argues that "a buyer of real estate should have the same freedom to

---

**5.** This is not to say that all restraints on contacting former customers will be found to be reasonable. For instance, if a business is so large that a restraint on contacting former clients would amount to a bar prohibiting the employee from practicing his or her specialty, the court will require the restraint to be drafted more narrowly. *See* Harlan M. Blake, *Employee Agreements Not to Compete,* 73 Harv.L.Rev. 625, 677 (1960).

A covenant not to contact former customers will also be unreasonable if the former employee did not have access to confidential information. *Restatement (Second) of Contracts* § 188, illus. 7. If the trier of fact finds that a noncompetition agreement did exist between Garrison and Metcalfe Investments, Garrison remains free to challenge the reasonableness of the restraint on this ground.

choose a realtor as a person would have to choose an attorney."[6]

Covenants not to compete for real estate brokers have been found to be enforceable and unenforceable, depending upon the facts of the case.[7] Covenants have been struck down because they were too broad in time and scope or because there were no trade secrets or threats of unfair competition involved, but never because noncompetition agreements for real estate brokers amounted to a *per se* injury to the public interest. *See* cases cited *supra*, note 7.

■ Garrison has provided us with no persuasive reason or legal precedent for her proposition that this covenant not to compete constitutes a violation of public policy. Accordingly, we find that such an agreement does not injure the public interest.[8]

We conclude that there are genuine issues of material fact that remain to be resolved regarding the covenant not to compete, both as to its existence and as to its terms. Taking the facts as Metcalfe Investments alleges, Garrison is not entitled to judgment as a matter of law on this question.

## D. *Garrison Was Not Entitled to Summary Judgment on Metcalfe Investments' Tort Claims.*

In her motion for summary judgment, Garrison moved "for an order granting her summary judgment on her claim for wages due and on claims brought against her by Metcalfe Investments, Inc." In her supporting memorandum, Garrison's counsel framed only two issues for resolution:

> This consolidated action concerns a single dispute ... regarding Garrison's claim for unpaid wages and Metcalfe Investment's [sic] counterclaim for damages resulting from Garrison's alleged breach of an oral employment contract.

The memorandum in support of Garrison's motion never mentioned nor argued Metcalfe Investments' tort claims. When AAR joined the motion for summary judgment, it too failed to specifically address the tort claims. When Metcalfe Investments filed its opposition, the briefing again only addressed Garrison's claims for back wages and the noncompetition agreement. The tort claims were not addressed by any party or the court at the July 13, 1994 hearing on the motion.

---

**6.** Courts have upheld covenants not to compete when applied to doctors on many occasions. *See* Ferdinand S. Tinio, Annotation, *Validity and Construction of Contractual Restrictions on Right of Medical Practitioner to Practice, Incident to Employment Agreement,* 62 A.L.R.3d 1014 (1975).

**7.** *See Rector–Phillips–Morse, Inc. v. Vroman,* 253 Ark. 750, 489 S.W.2d 1, 2–3 (1973) (refusing to enforce covenant not to compete for three years in employer's county where there was no evidence employee attempted to use employer's confidential information); *Welles v. O'Connell,* 23 Conn.Supp. 335, 183 A.2d 287, 288–89 (1962) (upholding covenant not to compete within town for two years); *Dalrymple v. Hagood,* 246 Ga. 235, 271 S.E.2d 149, 150–51 (1980) (upholding covenant not to compete in same county for three years); *Mike Bajalia, Inc. v. Pike,* 226 Ga. 131, 172 S.E.2d 676, 678 (1970) (upholding covenant not to compete within the county for eighteen months); *Vander Werf v. Zunica Realty Co.,* 59 Ill.App.2d 173, 208 N.E.2d 74, 77 (1965) (striking covenant not to compete for two years within five miles of employer's offices where no trade secrets involved and no client enticement occurred); *Blackwell v. E.M. Helides, Jr., Inc.,* 368 Mass. 225, 331 N.E.2d 54, 56 (1975) (upholding covenant not to compete for three years in multiple towns where employee had access to

files with confidential information on properties not available to public); *Abramson v. Blackman,* 340 Mass. 714, 166 N.E.2d 729, 730 (1960) (striking covenant not to use information from employer's files or information gained verbally for indefinite period); *Dunfey Realty Co. v. Enwright,* 101 N.H. 195, 138 A.2d 80, 82–83 (1957) (refusing to uphold covenant not to compete for three years within local area); *Steinfeld v. Hausen,* 180 Misc. 295, 40 N.Y.S.2d 683, 684 (Sup. 1943) (upholding covenant not to compete for one year within twenty square blocks from employer's office), *modified,* 269 A.D. 336, 55 N.Y.S.2d 722 (App.Dep't 1945); *Cohen Realty, Inc. v. Marinick,* 817 P.2d 747, 749 (Okla.App. 1991) (refusing to enforce covenant that contained no limit on geography and too long a time limit); *Pancake Realty Co. v. Harber,* 137 W.Va. 605, 73 S.E.2d 438, 443 (1952) (striking covenant not to compete for one year without territorial limits).

**8.** Garrison also makes a claim that she could have been violating state law if she refused to work with a buyer because of the noncompetition agreement. She cites provisions prohibiting discrimination in housing on the basis of race, sex, and disability. *See* AS 18.80.240(1) and 12 AAC 64.130(19). It is difficult to see how her compliance with the noncompetition agreement would cause her to violate Alaska's housing discrimination laws.

Based on this record, we conclude that Metcalfe Investments' tort claims were not properly before the trial court for summary adjudication. Our Civil Rules require the moving party to file with a motion for summary judgment "a memorandum showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Alaska R.Civ.P. 56(c). Garrison and AAR did not even attempt to do so on Metcalfe Investments' tort claims. While they did include language in their motion that indicated they sought summary judgment on all issues, Rule 56(c) places on the moving party the burden of proving that there is no issue of material fact and entitlement to judgment as a matter of law. Indeed, Rule 56(e) states that:

> When a motion for summary judgment *is made and supported* as provided in this rule ... the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Alaska R.Civ.P. 56(e) (emphasis added).

Only after the moving party meets this burden is the nonmoving party obligated to demonstrate the existence of genuine material factual disputes or that the moving party is not entitled to judgment as a matter of law. Alaska R.Civ.P. 56(e). Because Garrison and AAR never met this initial burden as to the tort claims, it was improper for the trial court to grant summary judgment on them.

## IV. CONCLUSION

Because of our resolution of these issues, it is not necessary to reach the other errors asserted by the parties in this appeal. The judgment of the trial court is REVERSED and REMANDED for further proceedings consistent with this opinion.